Nos. 2014-1392, 2014-1393

# In the United States Court of Appeals
### for the
# Federal Circuit

**EON CORP. IP HOLDINGS LLC,**
*Plaintiff-Appellant,*

*v.*

**AT&T MOBILITY LLC,**
*Defendant-Appellee.*

2014–1392

Appeal from the United States District Court for the District of Delaware
in No. 1:13-cv-00910-RGA, Judge Richard G. Andrews.

-----------------------------------

**EON CORP. IP HOLDINGS LLC,**
*Plaintiff-Appellant,*

*v.*

**FLO TV INCORPORATED,**
*Defendant-Appellee,*

*(caption continued on inside cover)*

## BRIEF FOR APPELLANT, EON CORP. IP HOLDINGS LLC

JOHN L. HENDRICKS
DANIEL SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave, Ste 1250
Austin, Texas 78701
512-474-2449
Attorneys for Plaintiff-Appellant

July 2, 2014

AND

**MOBITV INC.,**
*Defendant/Third Party Plaintiff/Counterclaimant-Appellee,*

AND

**U.S. CELLULAR CORPORATION,**
*Defendant-Appellee,*

AND

**LG ELECTRONICS MOBILECOMM U.S.A., INC.,**
*Defendant/Third Party Plaintiff/Counterclaimant-Appellee,*

AND

**SPRINT NEXTEL CORPORATION, HTC AMERICA INC, QUALCOMM, INC., SIMPLEXITY, LLC D/B/A WIREFLY, AND MOTOROLA MOBILITY LLC,**
*Defendants-Appellees.*

————————————

2014–1393

————————————

Appeal from the United States District Court for the District of Delaware in No. 1:10-cv-00812-RGA, Judge Richard G. Andrews.

**Form 9**

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

EON CORP. IP HOLDINGS LLC ____ v. AT&T MOBILITY LLC & FLO TV INC., et al.

No. 2014-1392, -1393

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
EON Corp. IP Holdings LLC ____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

EON Corporation IP Holdings LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

EON Corporation IP Holdings LLC is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

EON Corporation IP Holdings LLC is a wholly owned subsidiary of EON Corporation.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Reed & Scardino LLP: Daniel Scardino, Steven P. Tepera, Craig S. Jepson, Chad Ennis, John L. Hendricks, Mark W. Halderman, Rola Daaboul, Dominique G. Stafford, Joshua G. Jones, Matthew Murrell, Cabrach Connor, Jeffery Johnson, Jeff W. Moles, Jason Deats; Fox Rothschild LLP:  Gregory B. Williams.

7/2/2014
_____
Date

/s/  John L. Hendricks
_____
Signature of counsel

John L. Hendricks
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF RELATED CASES ............................................... viii

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE.................................................................3

STATEMENT OF THE FACTS ...............................................................5

SUMMARY OF ARGUMENT ...............................................................23

STANDARD OF REVIEW .......................................................................23

ARGUMENT ...............................................................................................24

I.    THE VIEWPOINT OF A PERSON SKILLED IN THE ART IS
      ESSENTIAL TO THE DETERMINATION OF DEFINITENESS OF A
      COMPUTER-IMPLEMENTED MEANS-PLUS-FUNCTION TERM
      UNDER 35 U.S.C. § 112 ¶ 2 AND 35 U.S.C. § 112 ¶ 6. ...............................24

      A.    A Person Skilled In The Art Remains The Touchstone For
            Determinations Of Definiteness Under 35 U.S.C. § 112 ¶ 2. .................25

      B.    The Interpretation of Means-Plus-Function Terms And
            Determinations Of Their Sufficiency Under 35 U.S.C. § 112 ¶ 6
            Are Governed By The Person-Skilled-In-The-Art Standard. .................29

      C.    A Court's Construction Of Computer-Implemented Means-Plus-
            Function Terms Requires The Lens Of A Person Skilled In The
            Art. .......................................................................................................32

            1.    The Algorithm Requirement Requires A Patent To Disclose
                  An Algorithm For Computer-Implemented Means-Plus
                  Function Terms. .................................................................................32

2. The *Katz* Exception Abrogates The Algorithm Requirement If The Function In A Computer-Implemented Term Can Be Performed By A General-Purpose Computer Without Special Programming. ...................................................................33

3. *Ergo Licensing* Creates Substantial Tension With The *Katz* Exception And Leaves The Controlling Test Unclear. ....................34

II. THE DISTRICT COURT ERRED WHEN IT HELD THAT THE CLAIMS OF THE '757 PATENT ARE INDEFINITE UNDER 35 U.S.C. § 112 ¶ 2 BECAUSE IT EMPLOYED A STANDARD THAT GIVES INSUFFICIENT DEFERENCE TO A PERSON SKILLED IN THE ART. ...................................................................37

A. The District Court Held That The Functions In The '757 Patent Were Indefinite Because Those Functions Could Not Be Performed By "Merely Plugging In" A Commercially Available Computer With Commercially Available Software. ................................38

B. Both The Algorithm Requirement And The *Katz* Exception Are Underpinned By The Viewpoint Of A Person Skilled In The Art And The Importance Of The Public-Notice Doctrine. .............................40

C. The District Court's Standard Impermissibly Restricts The Role Of A Person Skilled In The Art. ....................................................43

III. PROPER APPLICATION OF THE *KATZ* EXCEPTION REQUIRES THE COURT, FROM THE VIEWPOINT OF A PERSON SKILLED IN THE ART, TO DIFFERENTIATE BETWEEN *SOME* PROGRAMMING THAT IS ROUTINE TO THE ART AND *SPECIAL* PROGRAMMING THAT, WITHOUT AN ALGORITHM, LEAVES THE BOUNDS OF THE INVENTION UNCLEAR. .......................................44

A. Proper Deference To The Vantage Point Of A Person Skilled In The Art Requires Recognition That "Special" Programming Is Not Coextensive With "Any" Programming. ....................................................45

B. EON's Position Below Was Consistent With The Law. ..........................49

C. EON's Proposed Distinction Between *Some* Programming and *Special* Programming Is Consistent With This Court's Jurisprudence. ...........................................................51

CONCLUSION ........................................................................................................57

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
504 F.3d 1236 (Fed. Cir. 2007) ............................................................27, 28, 43

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ...................................................32, 40, 41, 51–54

*Atmel Corp. v. Info. Storage Device, Inc.*,
198 F.3d 1374 (Fed. Cir. 1999) ............................................................28, 30, 31

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ............................................................................53

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009) .................................................................32, 54

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
402 U.S. 313 (1971).............................................................................................27

*Creo Prods., Inc. v. Presstek, Inc.*,
305 F.3d 1337 (Fed. Cir. 2002) ......................................................28, 43, 45, 52

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
412 F.3d 1291 (Fed. Cir. 2005) ........................................................................51

*Elan Microelectronics Corp. v. Pixcir Microelectronics Co.*,
No. 2:10-cv-00014, 2013 WL 2394358 (D. Nev. May 30, 2013)..........47, 48, 49

*EON Corp. IP Holdings, LLC v. FLO TV Inc.*,
Nos. 10-812-RGA, 13-910-RGA, 2014 WL 906182
(D. Del. Mar. 4, 2014) ...............................................................................*passim*

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ...........................................................................56

*Ergo Licensing, LLC v. Carefusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012) .................................................................*passim*

*Finisar Corp. v. DirectTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ..................................................33, 41

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013) ........................23–24, 32, 41, 51

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ..........................................................32

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
    732 F.3d 1376 (Fed. Cir. 2013) ..................................................55, 56

*In re Katz Interactive Call Processing Patent Litigation*,
    639 F.3d 1303 (Fed. Cir. 2011) ........................................*passim*

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ..........................................................30

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
    336 F.3d 1308 (Fed. Cir. 2003) ..........................................................31

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ..........................................................30

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..............................................................28, 43, 45

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004) ..........................................................55

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ............................................45, 46, 51

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)............................................26–27, 43–45, 53

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ..................................................24, 41

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988) ..........................................................36

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ............................................................31, 43, 53

*O'Reilly v. Morse*,
  56 U.S. (15 How.) 62 (1853) ...................................................................25

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ...............................................................32

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...............................................................30

*Praxair, Inc. v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008) ...............................................................24

*S3 Inc. v. NVIDIA Corp.*,
  259 F.3d 1364 (Fed. Cir. 2001) .........................................................27, 44, 48

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) .....................................................29, 31, 43, 46

*Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) .................................................................24

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997)...............................................................................26

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) .....................................................32, 41, 46, 52

## FEDERAL STATUTES

28 U.S.C. § 1295 ...................................................................................1

28 U.S.C. § 1338 ...................................................................................1

35 U.S.C. § 112 ¶ 2 ........................................................................*passim*

35 U.S.C. § 112 ¶ 6 ........................................................................*passim*

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 8....................................................................24

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a)    There have been no other appeals in these cases.

(b)    As Appellant noted in its Motion to Consolidate, and for the reasons stated therein, case Nos. 2014-1392 and 2014-1393 are related in that they were consolidated for claim construction below.  Per this Court's grant of the Motion to Consolidate, these cases have been consolidated, and the caption above reflects that consolidation.  Apart from those two cases, Appellant knows of no other cases that are related to this matter.

## STATEMENT OF JURISDICTION

The cases below were brought as patent infringement actions in the District Courts for the District of Delaware (the "*FLO TV* action") and the District of Puerto Rico (the "*AT&T* action"), which both had jurisdiction under 28 U.S.C. § 1338(a). After the *AT&T* action was transferred and the cases were consolidated for claim construction in the District Court for the District of Delaware, that court found the patent-at-issue invalid. Pursuant to that finding, in the *FLO TV* action, the court granted Defendants-Appellees' Motion for Summary Judgment on March 4, 2014, and issued a final judgment on March 5, 2014; in the *AT&T* action, the court entered a Jointly Stipulated Final Judgment on March 18, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred by granting summary judgment on the grounds that the computer-implemented means-plus-function terms in the patent-at-issue were indefinite because they failed to fall within the general-purpose computer exception to the algorithm requirement.

2.  Whether a computer-implemented means-plus-function term for which no corresponding algorithm is disclosed is indefinite if a person of ordinary skill in the art would recognize the bounds of the claim.

3.  Whether the general-purpose computer exception to the algorithm requirement extends to functions of a general-purpose computer that may require *some* programming that does not rise to the level of *special* programming.

## STATEMENT OF THE CASE

On September 23, 2010, Plaintiff-Appellant EON Corp. IP Holdings, LLC ("EON") filed its Original Complaint in the District Court for the District of Delaware (the "*FLO TV* action"), alleging that multiple parties, including Defendants-Appellees FLO TV Incorporated; MobiTV Inc.; U.S. Cellular Corporation; LG Electronics Mobilecomm U.S.A., Inc.; Sprint Nextel Corporation; HTC America Inc.;  Qualcomm, Inc.; Simplexity, LLC D/B/A Wirefly; and Motorola Mobility LLC infringed U.S. Patent No. 5,663,757 ("'757").    (A47, A53–A61.)  On June 14, 2011, EON filed its Original Complaint in the District Court for the District of Puerto Rico (the "*AT&T* action"), alleging that several parties, including Defendant-Appellee AT&T Mobility LLC infringed multiple patents, including the '757 Patent.  (A64–A65, A68–A71.)

On May 2, 2013, the Puerto Rico court granted the parties' joint motion to sever the '757 infringement claims against Defendant-Appellee AT&T Mobility LLC, and those claims were transferred to the District Court for the District of Delaware (the "district court" or the "court").  (A107.)  The district court then consolidated the actions for the purposes of claim construction only.  (A160.)  On January 8 and 9, 2014, the court held the consolidated *Markman* hearing and summary judgment hearing in the *FLO TV* action. (A20–A21.)  On February 5, 2014, the court held an additional evidentiary hearing with expert witnesses

regarding several computer-implemented means-plus-function terms in the '757 Patent, and ordered additional briefing regarding those terms.  (A20–A21.)

On March 4, 2014, the district court issued a Memorandum Opinion,[1] *EON Corp. IP Holdings, LLC v. FLO TV Inc.*, Nos. 10-812-RGA, 13-910-RGA, 2014 WL 906182 (D. Del. Mar. 4, 2014), that construed eight computer-implemented means-plus-function terms that appear in various claims in the '757 Patent, holding that those terms were indefinite because the computer-implemented functions in those terms lacked a corresponding algorithm in the specification and failed to fall within the general-purpose computer exception to the algorithm requirement. (A26–A40.)  Pursuant to that construction, the district court granted summary judgment as to the Defendants-Appellees in the *FLO TV* action, who had moved for summary judgment on those grounds, and entered final judgment on March 5, 2014.  (A41.)

Because the *FLO TV* and *AT&T* actions were consolidated for claim construction only, and the *AT&T* action was not yet scheduled for dispositive motions, Defendant-Appellee AT&T Mobility LLC had not moved for summary judgment on invalidity grounds.  However, in light of the court's claim construction, on March 17, 2014, EON and AT&T Mobility jointly stipulated to a

---

[1]    In accordance with Federal Circuit Rule 28(a)(12), that Opinion is attached to this Brief as an addendum.  (*See* A18.)

final judgment, which the court entered on March 18, 2014. (A43, A46.) EON appeals from the district court's claim construction order common to both actions.

## STATEMENT OF THE FACTS

On September 2, 1997, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 5,633,757 ("'757") to Plaintiff-Appellant EON Corp. IP Holding, LLC's ("EON") predecessor, TV Answer, Inc., a company that applied for the invention on March 25, 1991, amid its development of television technology in the 1980s and 1990s. (A86–A87, A275–A276.) The '757 Patent describes a "local data processing station" that TV Answer, Inc. represented as the marriage of the TV and PC. (A1:Abstract, A7: 2:18–2:29, A275.) The local data processing station affords users a high level of interaction with the world by putting numerous options at the user's fingertips: television and premium cable content on demand, music, shopping, bank account management, and electronic mail and messaging. (A1:Abstract, A4:Fig. 5B, A6:Fig. 5, A7:2:18–A8:3:16.) This interactivity is facilitated, in part, by the invention's use of wireless communication, which transmits the user's commands to repeater stations and gives the unit broad communication capabilities. (A7:1:19–2:16.)

Due to advances in technology—and the ever-shrinking form of computers and video screens—EON brought both patent infringement actions below, arguing that the modern iteration of the '757 Patent's local subscriber data processing

-5-

station is a smartphone with certain capabilities. (A275.) EON alleges that, as taught by the '757 Patent, a smartphone affords its users the disclosed interaction and the ability to choose and watch television, video, and movies on demand, as well as engage in other forms of user-interactive functionality, over a wireless network. (A275.) Thus, under EON's infringement theory, Defendants-Appellees ("Appellees") below fit into one of three general categories: (1) companies that manufacture and sell smartphones that infringe the '757 Patent;[2] (2) cellular network providers whose networks enable users to utilize smartphones to infringe the '757 Patent; and (3) content providers whose services operate in the same manner disclosed in the '757 Patent, allowing users to interact and select content on a smartphone exactly like the '757 Patent's local data processing station. (A86–A102.)

While both actions below were pending, the '757 Patent was submitted to the PTO for reexamination. On August 14, 2012, the PTO issued a Reexamination Certificate, amending several claims and affirming the patentability of the invention. (A12, A13:1:13–1:20.) The patent was subsequently submitted for a second reexamination, which resulted in an affirmance of the claims without modification. (A16, A17:1:9–1:13.)

---

[2]   Appellees that manufacture parts integral to the smartphone's infringement of the '757 Patent, like Qualcomm's manufacture of microprocessors, fall within this category.

-6-

After reexamination, the '757 Patent contained five independent claims (Claims 1, 7, 8, 9, and 10), and five claims dependent on Claim 1 (Claims 2, 3, 4, 5, and 6). (A13:1:13–1:20.) The five independent claims demarcate various iterations of a "local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive television receiver stations." (A13:1:22–1:25, A13:2:11–2:15, A14:3:23–3:27, A14:4:23–4:27, A15:5:7–5:10.) Representative of the invention is Claim 8:

> A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,
>
> > an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,
> >
> > a television receiver with a video display screen, program control means and television program channel selection means,
> >
> > a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of paid operation control system,
> >
> > a programmable computer interconnected with said television receiver and said operation control system,
> >
> > radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the

subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels wherein a channel selection menu identifying authorized channels is displayed automatically on said video screen,

means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels and means for causing selected themes to

automatically display a second menu displaying available television programs relating to that selected theme, means responsive to said subscriber manual control means for selecting a preferred theme from said different themes presented when said first menu is displayed on said screen, and means in said control system for identifying on said second menu said television programs available relating to the selected theme, *and*

> *means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus.*

(A14:3:23–4:22.)

Taking in to account the reexamination, the '757 Patent contains eight computer-implemented means-plus-function terms:[3]

1. "means under control of said replaceable software means for indicating acknowledging of shipment of an order from a remote station," appearing in Claim 7;

2. "means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus," appearing in Claims 1–6 and 8–10;

3. "means responsive to said self contained software for establishing a mode of operation for

---

[3]   Those terms are identified here by the numbers that the district court used in its Memorandum Opinion construing those terms.  In the *FLO TV* action Joint Claim Construction briefing and the joint *Markman* hearing, the terms were referred to, respectively, as Terms 13, 15, 16, 17, 18, 19, 20, and 21.

selection of one of a plurality of authorized television program channels," appearing in Claim 8;

4. "means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels," appearing in Claim 8;

5. "means for causing selected themes to automatically display a second menu," appearing in Claim 8;

6. "means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station," appearing in Claim 9;

7. "means controlled by replaceable software means operable with said operation control system for establishing and controlling fiscal transactions with a further local station," appearing in Claim 10;

8. "means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station," appearing in Claim 10.

(A13–A14, A26–A39.)

In its filings to the district court, EON argued that the computer-implemented means-plus-function terms in the '757 Patent were definite. Specifically, EON argued that a person of ordinary skill in the art would understand the scope of the functions in each term because that person would understand a general-purpose computer to be capable of performing those

functions.  (*See, e.g.*, A453–55.)  EON relied on a declaration and live testimony of

its expert, Dr. Charles Sauer,[4] for this argument.

In a declaration attached to EON's claim construction briefing, Dr. Sauer

first noted that a person of ordinary skill in the art at the time of the invention

(1991) "would likely have earned a Bachelor's Degree in Electrical engineering or

Computer Science and two years of professional experience in programming or

digital communications."  (A383.)  This definition was not contested by Appellees'

expert.  (A485:85–86.)  Throughout his declaration, Dr. Sauer provided detailed

analysis that, from the perspective of that person, each of the computer-

implemented functions in the '757 Patent could be performed by a general-purpose

computer without special programming.  (*See, e.g.*, A386:¶¶35–37.)

Specifically, Dr. Sauer noted that a person skilled in the art would

understand the functions as performable by "an off the shelf, general-purpose

computer normally provided by a standard personal computer or engineering

workstation at the time of filing," including "the Apple Macintosh with Mac OS

System 6 (i.e., an 'Apple computer'), UNIX® engineering workstations from

Digital Equipment Corporation (DEC), Hewlett-Packard (HP) or IBM with

---

[4]   Dr. Sauer, as the district court noted, is well-qualified to discuss the
functionality of computers in and around the time of the patent.  (A30.)  After
receiving a Ph.D. in Computer Science from the University of Texas in 1975,
Dr. Sauer was the lead architect of IBM's version of UNIX from 1982 to 1989,
at which time he moved to Dell and led the development of computer
technology there until 1993.  (A382–83.)

OSF/Motif, and industry standard PCs with Microsoft Windows 3.0 (i.e., a 'Windows computer')." (A383–84.) Dr. Sauer further noted that these "widely available, general-purpose, hardware systems" would have included "'off the shelf' software in their operating systems and operating system services to provide Application Programming Interfaces ('APIs') with functions that allow a [person skilled in the art] to have performed such standard computing functions as displaying menus, customizing these menus, taking action based on user selection of a menu item, and so forth." (A383–84.)

With this understanding of the skills of an ordinary artisan, and the hardware and software that would have been available to such a person, Dr. Sauer proceeded term-by-term, providing detailed analysis of how the function of each term fell within the functionality of a general-purpose computer. (A382–90.) Two examples are emblematic of his analysis.

For Term 2—"means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus"—Dr. Sauer provided thorough analysis from the perspective of a person skilled in the art, defining the function performed by the computer, explaining how a general-purpose computer at the time would perform that function, and then linking that functionality with

specific structures disclosed in the specification of the '757 Patent.  As he states in his declaration:

> 23.  The function of "reconfiguring the operating modes by adding or changing features and introducing new menus" means, essentially, replacing one software application with another. *This is a standard function that is performed by a general-purpose computer.*

> 24.  Replacing one software application with another *was performable by a general-purpose computer at the time of filing, because the operating systems available at the time allowed the ordinary user to choose amongst software applications.*

> 25.  The '757 Patent specification discloses that *the software controlled programmable microprocessor data processing system could perform this function* where it discusses reconfiguring the system via the replacement of software, such as by overwriting random access memory (R.A.M.) in the data processing system 27, at Column 5, Lines 40-53 as displayed in in Figures 3, 4 and 5.

(A384–85 (emphasis added).)

For Term 7—"means controlled by replaceable software means operable with said operation control system for establishing and controlling fiscal transactions with a further local station"—Dr. Sauer provided a similarly well-reasoned expert analysis:

> 46.  The function of "establishing and controlling fiscal transactions with a further local station" means, essentially, enabling a connection for a financial transaction (such as a customer making a purchase). *This is a standard function performed by a general-purpose computer.*

47.    *Enabling a connection for a financial transaction was performable by a general-purpose computer at the time of filing, because the operating systems available at the time provided for networking* with modems, Local Area Networks (LANs), and Wide Area Networks (WANs) such as the Internet. As discussed below, *this functionality was accessible to a [person skilled in the art] via the operating systems and APIs that were available with the operating systems.*

48.    A [person skilled in the art] would be able to have enabled a connection for a financial transaction by implementing the available operating system components for networking. In a UNIX general-purpose computer, a [person skilled in the art] would likely have used "sockets", APIs which unify networking with file APIs. Thus, for example, in a UNIX general-purpose computer, the [person skilled in the art] could use the pre-installed Input/Output APIs, either at the system call level or using the standard I/O library as described above.

49.    In an Apple or Microsoft computer at the time of filing, a [person skilled in the art] would likely have used networking APIs such as AppleTalk and NETBIOS, respectively.

50.    The specification teaches "the computer program control means comprises software computer program control means, preferably in the form of replaceable data 35 storage units such as read only memory chips," (2:32-35). *A [person skilled in the art] would know that "establishing and controlling fiscal transactions with a further local station" is a function that would normally be accomplished by a general-purpose computer.*

51.    *The '757 Patent specification discloses a general-purpose computer and the related, low-level control software to perform this function* where it discusses a microprocessor (Figures 3, 5; 4:37-38; 5:1; 5:64-6:67; 6:15-17) using low-level control software, of

-14-

the type that I understand to include the previously mentioned APIs (Figures 3, 5; 2:31-34; 4:37-38; 4:50-51; 4:52-62; 5:64-6:67; 6:15-17).

52. I have been informed that [the '757 inventor] Mr. Morales testified that he used a demonstrative model assembled using an off-the-shelf computer running low-level, pre-installed software to perform the function of establishing and controlling fiscal transactions with a local station, and this would be in accordance with my previously-stated opinion that *a general-purpose computer is all that is required to perform such a function.*

(A388 (emphasis added).)

At the end of his declaration, Dr. Sauer provided a short primer to explain the various functions a general-purpose computer could perform, referencing materials that would have been at the fingertips of a person skilled in the art in 1991, including "Petzold," the shorthand name for a book by author Charles Petzold titled "Programming Windows: The Microsoft Guide to Writing Applications for Windows 3." As Dr. Sauer notes, "Petzold's books, especially this one, are considered standard reading for Windows programmers." (A390.)

Turning to a specific function disclosed in the '757 Patent as a demonstrative example—"providing a menu"—Dr. Sauer then used several passages from Petzold (as well as another common reference guide utilized by persons skilled in the art) to demonstrate what a person skilled in the art would have understood that function to mean. (A390–96.) In his analysis, Dr. Sauer not

-15-

only noted that such a person would have understood that the function could be performed by a general-purpose computer, but he also provided the elementary code in the C programming language that a person skilled in the art would have employed to enable the function. (A390–96.)

After the consolidated Claim Construction and Summary Judgment hearings, the district court ordered a supplemental evidentiary hearing to directly address the definiteness requirement and the computer-implemented terms. At that supplemental hearing, Dr. Sauer reiterated his viewpoint that a person skilled in the art would understand the bounds of each of the computer-implemented means-plus-function terms in the '757 Patent, noting that a person skilled in the art would understand that the functions described in those inventions were performable by a general-purpose computer without special programming. (A467:15–16, A469:21.)

Dr. Sauer testified that his expert opinion regarding the functions-at-issue was from the vantage point of a person skilled in the art at the time of the invention: "My understanding is we're here *to understand these terms* in the context of the '757 patent, *by a person of skill in 1991*." (A467:15 (emphasis added).) In addition, during direct examination, Dr. Sauer was asked to explore his understanding from the vantage point of a person skilled in the art: "And in your opinion how would a person of skill in the art in 1991 *understand* that term?" (A467:15–16 (emphasis added).)

-16-

Throughout his testimony, Dr. Sauer consistently explained that a person skilled in the art would understand the scope of the claims, specifically noting that the functions-at-issue could be performed by a general-purpose computer because those functions were "very basic," "routine," and "elementary." (A467:15–A468:20.) To emphasize this point, Dr. Sauer referred to his experience at Dell Computer, where he was employed from 1989 to 1993 and oversaw the development of hardware and software for personal computers. For every function in the computer-implemented terms at issue, Dr. Sauer testified that the function was so routine to the knowledge base of a person skilled in the art that he would have assigned the programming and enablement of those functions to a first-year or entry-level programmer at Dell in 1991:

> Q. Could a person of ordinary skill in the art in 1991, *understand* how to do that?
>
> A. Not only a person of ordinary skill, but an entry-level programmer should *understand* how to do that.

(A469:24–A470:25 (emphasis added); *see also* A467:15–A471:31.)

EON relied on this expert testimony in its arguments to the court, emphasizing much of the same analysis that it does here. (*See, e.g.*, A453–55, A457–58.) In those filings, EON argued that (1) the viewpoint of a person skilled in the art is critical in definiteness inquiries, and (2) the terms-at-issue fell within this Court's exception to the algorithm requirement explained in *In re Katz*

-17-

*Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011), that "functions [that] can be achieved by any general purpose computer without special programming" do not require an algorithm. *Id.* at 1316.

Accordingly, EON argued that the "special programming" language from *Katz* should apply to programming that was beyond routine programing that was well-known in the art. (A453.) EON reasoned that, if a person skilled in the art understands the bounds of a computer-implemented means-plus-function term, and if this person understands that a general-purpose computer can perform the function without the creation of novel programming for that computer, then—*even if* the function required routine programming—the term was definite because it did not require "special programming." (A453–57.) Thus, under EON's interpretation of the law, the claims were definite because Dr. Sauer testified that a person skilled in the art would know the bounds of those claims and that the functions did not require "special programming" because their implementation was routine in the art.

Appellees employed a different strategy altogether. Instead of emphasizing the understanding of a person skilled in the art or this Court's analysis in *Katz*, Appellees adopted language from this Court's application of the *Katz* exception in *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012). (A523.) In *Ergo*, this Court rejected a patentee's argument that a computer-implemented term fell within the *Katz* exception, reasoning that a general-purpose

computer could not perform the function-at-issue because the function required more than "merely plugging in" the general-purpose computer.   673 F.3d at 1364–65.

Appellees interpreted the "merely plugging in" language broadly, arguing that the language circumscribed the *Katz* exception and that any function that could not be achieved by "merely plugging in" a commercially available, off-the-shelf computer in 1991 could not fall within the *Katz* exception.   (A523.)   Thus, Appellees[5] contended that the '757 Patent was invalid because the eight computer-implemented means-plus-function terms were indefinite for failing to meet the algorithm requirement and for failing to fall within the scope of the *Katz* exception.   (A520–25.)

In support of this interpretation of the law, Appellees' expert, Dr. Jack Grimes, focused on whether a commercially available off-the-shelf computer could achieve the functions-at-issue.   Dr. Grimes took the position that adding *any* commercially available software well known in the art, like Microsoft Word, to a general-purpose computer converted the computer into a special-purpose computer.   (A487:93, A488:100.)   Thus, Dr. Grimes testified that a function like bolding text in a word processor fell outside of the general-purpose computer

---

[5]   Although Defendants-Appellees in the *FLO TV* action and Defendant-Appellee AT&T Mobility took slightly different positions in their claim construction briefing regarding these eight terms, those differences are immaterial for the arguments that follow.

exception—despite being known in the art—because a Macintosh bought in 1991 could not achieve that task without installing additional software.  (A487:95–A488:98.)

Dr. Grimes also testified that the functions-at-issue in the '757 Patent could not be achieved by a general-purpose computer alone and required programming to implement.  (A484:84–A485:85.)  Under the theory that *any* programming and *special* programming are the same, Appellees argued that the *Katz* exception was not met because the functions-at-issue required a person skilled in the art to interact with that computer to some degree beyond "merely plugging in" that computer.  (A523.)  Dr. Sauer's testimony that a person skilled in the art would understand the functions in the terms to fall within the functionality of a general-purpose computer was largely immaterial to Appellees' strategy; for their interpretation of the *Katz* exception, programming—even if routine and well-known in the art—was a question of existence, not of degree.  (A522.)

The district court ultimately sided with Appellees, finding all of the terms indefinite because their functions could not be performed by a commercially available, off-the-shelf general-purpose computer with off-the-shelf software.  (A26.)  In reaching its decision, the district court acknowledged that *some* difference must exist between a general-purpose computer without *any* programming and a general-purpose computer without *special* programming, in

part because the *Katz* Court used the word "special" and Appellees' conflation of *any* and *special* would rob that word of its meaning. (A23–25.) The district court, however, drew its own bright-line, reasoning that any software that was "commercially available" to a regular consumer in 1991 should be included in the *Ergo* "merely plugging in" test. In short, the district court applied a test that asked: Could the function be achieved by "merely plugging in" a general-purpose computer from 1991 if commercially available software from 1991 was installed on that computer? (A24.) As the district court noted:

> In my view, the proper distinction between "special programming" and "programming" is whether the programming in question is commercially available at the time of the invention. If the programming required to perform the claimed function can be purchased off-the-shelf, then it is ordinary programming and no algorithm is required to comply with § 112, ¶ 6's structure requirement. A general purpose computer is sufficient structure in this situation. If, however, a store-bought computer combined with off-the-shelf programming cannot perform the claimed function, then there is a need for special programming, and § 112, ¶ 6 therefore mandates the disclosure of an algorithm.

(A29.)

Accordingly, the district court found much of Dr. Sauer's testimony immaterial because Dr. Sauer openly admitted that a person skilled in the art would have to employ common, elementary programming to enable the functions-at-issue. According to the district court, "The fact that neither a store-bought

computer nor a store-bought computer with store-bought software could achieve the claimed function places this case outside of the *Katz* exception."   (A29.) Pursuant to its understanding of the law, the district court severely limited the role of a hypothetical person skilled in the art in its analysis, reducing that standard's relevance to the limited inquiry of what hardware and software a consumer could acquire off-the-shelf from a retail store in 1991: "If the required programming is more sophisticated than what can be readily purchased *by a consumer*, then the algorithm must be disclosed as the quid pro quo for receiving patent protection." (A30 (emphasis added).)

In reaching this conclusion, the district court also supplanted how a person skilled in the art would understand the invention with the level of disclosure necessary to teach the lay public how to accomplish the function-at-issue:

> Dr. Sauer believed that the lack of disclosure was not fatal to EON's case because a "person of relatively elementary skill in the art" could write the code that would perform the function at issue. But that is inconsequential to the current inquiry. The test is not whether a [person skilled in the art] could write the necessary computer program, but whether the patentee *taught the public* how to accomplish the claimed function in the specification by disclosing the algorithm. The patentee is required to disclose *this expertise* in exchange for patent protection.

(A30–31 (emphasis added).)

The district court's analysis of all eight terms turned on this interpretation of the law.  Because EON's expert, Dr. Sauer, admitted that *some* programming was required to execute the functions in each term, the resolution of each term was the same.  (A25–40.)  Pursuant to its interpretation of the law, the district court held that all of the terms were indefinite because they failed to fall within the *Katz* exception.  Because the terms touched every claim, the district court thus held that the entire patent was invalid.  (A41.)

## SUMMARY OF ARGUMENT

The Court should reverse and remand the district court's finding that the functions-at-issue are indefinite on the grounds that the district court used a standard that does not give adequate deference to the viewpoint of a person skilled in the art.  In determining whether a computer-implemented means-plus-function term falls within the *Katz* exception pursuant to 35 U.S.C. § 112 ¶ 2 and 35 U.S.C. § 112 ¶ 6, a court should find such a term definite if a person skilled in the art would understand that a general-purpose computer could perform the function in the term without special programming, even if such a person would understand that the function would be implemented by routine programming.

## STANDARD OF REVIEW

"Claim construction and indefiniteness determinations are reviewed without deference."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1316 (Fed.

Cir. 2013); *see also Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1365 (Fed. Cir. 2008) (noting claim construction and indefiniteness are both questions of law "subject to plenary review"). In addition, this Court "review[s] a grant of summary judgment de novo, reapplying the standard that the district court employed." *Net MoneyIN*, 545 F.3d at 1365.

## ARGUMENT

## I. THE VIEWPOINT OF A PERSON SKILLED IN THE ART IS ESSENTIAL TO THE DETERMINATION OF DEFINITENESS OF A COMPUTER-IMPLEMENTED MEANS-PLUS-FUNCTION TERM UNDER 35 U.S.C. § 112 ¶ 2 AND 35 U.S.C. § 112 ¶ 6.

As this Court has often observed, the concept of a person of ordinary skill in the art pervades patent law at its most fundamental level, as "patents are written by and for skilled artisans." *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999). This construct aids the goals of the patent law system to foster "the progress" of cumulative development in the art. *See* U.S. Const. art. I, § 8, cl. 8. A person skilled in the art serves the important function of fulfilling the public-notice doctrine, which puts the "public"—which is to say, the population of those skilled in the art—on notice of the bounds of the invention. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).

This construct is also critical to determinations that the invention is novel and non-obvious, ensuring the public that the patentee has offered a true innovation to the art in return for the monopoly that she has received. *See id.* By

-24-

understanding those bounds through the eyes of one skilled in the art, the public may, in turn, practice—and innovate upon—the invention, pushing the art further. Indeed, this founding principle of modern patent law dates back at least one hundred and fifty years, as the Supreme Court, in 1853, noted that the Patent Act of 1836 required that a patent's specification be specific enough for "to enable *any person skilled in the art or science to which it appertains*, or with which it is most nearly connected, to make, construct, compound, and use the [invention]." *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 118 (1853) (emphasis added). Relevant to Appellant's argument here, the standard of a person skilled in the art can be found throughout the doctrine governing the construction of computer-implemented means-plus-function terms.

## A. A Person Skilled In The Art Remains The Touchstone For Determinations Of Definiteness Under 35 U.S.C. § 112 ¶ 2.

A critical component of the public-notice doctrine, 35 U.S.C. § 112 ¶ 2 (2012) requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[6] The viewpoint of a person skilled in the art is central to the definiteness inquiry in § 112 ¶ 2—that is, whether the patent has particularly pointed out and distinctly claimed the subject matter of the invention.

---

[6]  For the purposes of the analysis here, the post-American Invents Act version of the statute is virtually identical. *See* 35 U.S.C. § 112(b) (2014).

In *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the Supreme Court reiterated the centrality of the viewpoint of a person skilled in the art, holding "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, *those skilled in the art* about the scope of the invention." *Id.* at 2124 (emphasis added).   In its interpretation of § 112 ¶ 2, the Court emphasized two doctrines that animated its "reasonable certainty" principle.

First, it noted the importance of several principles of patent interpretation: the definiteness inquiry turns on (1) the perspective of a person skilled in the art—vis-à-vis attorneys or judges, (2) at the time the patent was filed, (3) reading the patent in light of the specification and its prosecution history.  *Id.* at 2128.  Second, the Court noted that definiteness doctrine reflects a "delicate balance" between, on one hand, the imprecision of language and "[s]ome modicum of uncertainty" that accompanies an attempt to reduce an invention to writing and, on the other hand, the necessity of the patent to provide "clear notice" to the public of the bounds of the invention.  *Id.* at 2128–29.  In rejecting the "insolubly ambiguous" standard for indefiniteness, the Court noted that that standard "diminish[ed] the definiteness requirement's public-notice function." *Id.* at 2130.[7]

---

[7]   The Supreme Court's emphasis on the public-notice doctrine echoes its application of the doctrine to other patent principles.  *See, e.g.*, *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30 (1997)

The *Nautilus* Court articulated, in no uncertain terms, that if a person skilled in the art understands the bounds of the invention "with reasonable certainty," then the patent is definite. *See* 134 S. Ct. at 2124, 2128–30. In focusing on the inquiry, the Supreme Court noted that such a person be afforded the full weight of her intelligence and work experience in determining the scope of claims, *id.* at 2128–29, a principle that this Court has frequently echoed:

> The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for *patents are written for persons experienced in the field of the invention*. To hold otherwise would require every patent document to include a technical treatise for the unskilled reader. Although an accommodation to the "common experience" of lay persons may be feasible, *it is an unnecessary burden for inventors* and has long been rejected as a requirement of patent disclosures.

*S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) (citation omitted) (quoting *Atmel Corp. v. Info. Storage Device, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)); *see also AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1240 (Fed. Cir. 2007) ("The test for definiteness asks whether one skilled in

---

(emphasizing the public-notice function as a reason to cabin broad applications of the doctrine of equivalents); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 343 (1971) ("A patent by its very nature is affected with a public interest." (internal quotation marks omitted) (quoting *Precision Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945))).

the art would understand the bounds of the claim when read in light of the specification.").

This emphasis on the construct of a person skilled in the art as *skilled artisan* reflects the balance of putting the public—that is, other skilled artisans—on notice of the bounds of the invention, while also ensuring that a patent does not become a treatise on what is already known in the art.  *See Atmel Corp. v. Info. Storage Device, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("The specification would be of enormous and unnecessary length if one had to literally reinvent and describe the wheel.").  Thus, it is important to note that a person skilled in the art is indeed *skilled*, which is girded by several characteristics.

First, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton."  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); *accord AllVoice Computing*, 504 F.3d at 1242.  Second, a person skilled in the art is to be afforded the intelligence of both her knowledge in the art and her understanding of the patent in the context of what it requires.  As this Court has noted, the § 112 ¶ 6 requirement that *some* structure be disclosed "does *not* raise the specter of an unending disclosure of what everyone in the field knows."  *Atmel Corp.*, 198 F.3d at 1382 (emphasis added).  Indeed, this Court has found that specific details of structure can "be implicit" given a person of skill's knowledge. *See Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002).

Third, a person skilled in the art is skilled *in the art*, which means that the level of

detail required for understanding particular portions of a patent is affected by how

that person would view a particular claim element in relation to the invention as a

whole:

> "The amount of detail required to be included in claims
> depends on the particular invention and the prior art." In
> turn, the amount of detail that must be included in the
> specification depends on the subject matter that is
> described and its role in the invention as a whole, in view
> of the existing knowledge in the field of the invention.

*Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011)

(citation omitted) (quoting *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*,

758 F.2d 613, 624 (Fed. Cir. 1985)).

## B. The Interpretation of Means-Plus-Function Terms And Determinations Of Their Sufficiency Under 35 U.S.C. § 112 ¶ 6 Are Governed By The Person-Skilled-In-The-Art Standard.

The standard of a person skilled in the art is critical to determine whether a

patent has satisfied the requirements of § 112 ¶ 6. Corollary to the public-notice

function, 35 U.S.C. § 112 ¶ 6 allows a patentee to claim an invention in means-

plus-function language but requires the patentee to include corresponding structure

in the patent's specification:

> An element in a claim for a combination may be
> expressed as a means or step for performing a specified
> function without the recital of structure, material, or acts
> in support thereof, and such claim shall be construed to

-29-

cover the corresponding structure, material, or acts described in the specification and equivalents thereof.[8]

The assessment of whether a means-plus-function term satisfies these disclosure requirements is a matter of claim construction, which in turn begins with the viewpoint of a person skilled in the art:

> The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are *addressed to* and *intended to be read by* others of skill in the pertinent art.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (emphasis added) (citation omitted); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[A] court looks to those sources available to the public that show *what a person of skill in the art would have understood* disputed claim language to mean." (emphasis added)). To put it succinctly, "claim construction is *firmly anchored* in reality *by the understanding* of those of ordinary skill in the art." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) (emphasis added).

As this Court noted in *Atmel*, 198 F.3d 1374, this lens extends equally to the construction of means-plus-function terms:

---

[8]   Again, the differences between the pre- and post-AIA versions of the statute are immaterial for the analysis here. *See* 35 U.S.C. § 112(f) (2014).

That the "one skilled in the art" analysis should apply in determining whether sufficient structure has been disclosed to support a means-plus-function limitation flows naturally from the relationship between claim construction and § 112, ¶ 2. We have previously observed that . . . in the § 112, ¶ 6 context, a court's determination of the structure that corresponds to a particular means-plus function limitation is indeed a matter of claim construction. As it is well-established that claims are to be construed *in view of the understanding of one skilled in the art*, the closely related issue concerning whether sufficient structure has in fact been disclosed to support a means-plus-function limitation should be analyzed *under the same standard*.

*Id.* at 1379 (emphasis added) (citations omitted); *see also Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

Bringing these principles together, this Court recently noted that, "[u]nder 35 U.S.C. § 112 ¶ 2 and ¶ 6, therefore, 'a means-plus-function clause is indefinite *if a person of ordinary skill in the art* would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (emphasis added) (quoting *AllVoice Computing*, 504 F.3d at 1241); *see also Typhoon Touch*, 659 F.3d at 1383–84 ("[T]he specification must contain sufficient descriptive text by which *a person of skill in the field of the invention* would 'know and understand what structure corresponds to the means limitation.'" (emphasis added) (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008))).

-31-

## C. A Court's Construction Of Computer-Implemented Means-Plus-Function Terms Requires The Lens Of A Person Skilled In The Art.

### 1. The Algorithm Requirement Requires A Patent To Disclose An Algorithm For Computer-Implemented Means-Plus Function Terms.

To construe a means-plus-function term, a court uses the oft-cited two-step process of first, defining the claim's function, and second, identifying corresponding structure in the patent's specification. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). At the second step in the construction of a computer-implemented means-plus-function term, this Court "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). The "algorithm requirement" accomplishes this task: "[w]hen dealing with a 'special purpose computer-implemented means-plus-function limitation,' we require the specification to disclose the algorithm for performing the function." *Function Media*, 708 F.3d at 1318 (quoting *Noah Sys.*, 675 F.3d at 1312); *see also Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009); *Aristocrat*, 521 F.3d at 1333; *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999). Pursuant to the algorithm requirement, a patent "must disclose, at least to the satisfaction of *one of ordinary skill in the art*, enough of an algorithm to

provide the necessary structure under § 112, ¶ 6," although the algorithm can be expressed in "any understandable terms," including "a mathematical formula, in prose, or as a flow chart, or in any other manner that provides *sufficient* structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (emphasis added) (citation omitted).

> **2. The *Katz* Exception Abrogates The Algorithm Requirement If The Function In A Computer-Implemented Term Can Be Performed By A General-Purpose Computer Without Special Programming.**

In 2011, this Court created an exception to the algorithm requirement. In *In re Katz*, 639 F.3d 1303, the Court held that "functions [that] can be achieved by any general purpose computer without special programming" did not require an algorithm. *Id.* at 1316. Applying that standard, the *Katz* Court noted that three computer-implemented functions of the patent-at-issue—processing, receiving, and storing—were "coextensive with the structure disclosed [in the patent-at-issue's specification], i.e., a general purpose processor" (absent a more restrictive narrowing of those terms on remand). *Id.* Thus, the Court reasoned that an algorithm was unnecessary for those functions, as the bounds of those claims were capable of being understood by a person skilled in the art because such a person would understand that the disclosed hardware was sufficient to perform those functions.

In reaching its decision, the Court noted that the algorithm requirement was being read "too broadly" by the district court and the alleged infringers, and that the algorithm requirement should not extend to all computer-implemented means-plus-function terms. *Id.* at 1316–17. From this perspective, providing additional disclosure—in the form of an algorithm—to a person skilled in the art was unnecessary because, based on her knowledge in the art, and reading the patent as a whole, a person skilled in the art could understand the bounds of the invention. *See id.* at 1316–17 (explaining that, on remand, the district court would have to consider the viewpoint of a person skilled in the art if it construed those terms more narrowly).

### 3. *Ergo Licensing* **Creates Substantial Tension With The** *Katz* **Exception And Leaves The Controlling Test Unclear.**

In 2012, the Court issued its opinion in *Ergo Licensing*, 673 F.3d 1361. In *Ergo*, the Court rejected a patent holder's argument that computer-implemented functions in the patent-at-issue met the *Katz* exception. *Id.* at 1364–65. On one hand, the *Ergo* Court purported to apply the *Katz* standard and quoted the test directly from *Katz*: "when the function 'can be achieved by any general purpose computer without special programming,'" it does not need an algorithm. *Id.* (quoting *Katz*, 639 F.3d at 1316). On the other hand, the opinion took issue with *Katz*, calling the exception "narrow" and substantially circumscribing its reach: "[i]t is only in the *rare circumstances* where any general-purpose computer

-34-

without any special programming can perform the function that an algorithm need not be disclosed." *Id.* at 1365 (emphasis added).[9]

Critically, in is application of the *Katz* standard, the *Ergo* Court held that the function-at-issue in that case required an algorithm because that function "require[d] more than *merely plugging in* a general-purpose computer." *Id.* (emphasis added). In using the words "merely plugging in" in its application of the *Katz* exception, the *Ergo* Court did not opine on whether it meant to modify or narrow the *Katz* test, or if that language was intended only to describe the function-at-issue. *See id.* Either way, at its core, the *Ergo* Court's line-drawing at the functions accomplished by "merely plugging in" a computer would appear to truncate if not altogether preempt the viewpoint of a person skilled in the art in making determinations of what can be accomplished with a general-purpose computer without special programming.

Specifically, a "merely plugging in" standard undermines any role for the knowledge, skill, and creativity that the law affords a person skilled in the art at the time of the invention. *See supra* Part I.A. Instead, the standard treats a skilled artisan as a research historian or archivist, asking the person skilled in the art to opine only on what a computer at the time of the invention could accomplish after

---

[9] The *Ergo* dissent noted that it viewed the majority as overly restrictive of *Katz*. *See Ergo*, 639 F.3d at 1371 (Newman, J. dissenting) (collecting cases).

being "merely plug[ed] in." This standard amounts to a *per se* rule that short circuits the centrality of a person skilled in the art to a definiteness inquiry.

In addition, although it remains unclear that the *Ergo* Court meant to replace the *Katz* test with a "merely plugging in" standard, the language is inconsistent with *Katz* and leaves the law confused. First, *Ergo* appears to circumscribe *Katz* when the *Katz* Court itself suggested that it was the algorithm rule that needed narrowing, not the general-purpose computer exception. Second, a "merely plugging in" standard would seem to overrule portions of *Katz*, like the holding that "storing" falls within the exception, because such a function would require more than "merely plugging in" a computer (e.g., a user must instruct the computer to store the data in a particular format, using a particular name, in a particular location).

To the extent that *Ergo* or its "merely plugging in" standard overturns a portion of *Katz*, this Court should reject such a reading because the *Ergo* panel was not empowered to overturn *Katz*: "This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*. Where there is direct conflict, the precedential decision is the first." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765

(Fed. Cir. 1988) (citation omitted).[10]  To the extent that *Ergo* conflicts with the principles described herein, and for the reasons below, this Court should clarify the law and limit *Ergo*'s effect on the *Katz* exception.

## II.  THE DISTRICT COURT ERRED WHEN IT HELD THAT THE CLAIMS OF THE '757 PATENT ARE INDEFINITE UNDER 35 U.S.C. § 112 ¶ 2 BECAUSE IT EMPLOYED A STANDARD THAT GIVES INSUFFICIENT DEFERENCE TO A PERSON SKILLED IN THE ART.

In its Summary Judgment Order, the district court held that the computer-implemented functions of the '757 did not fall within the general-purpose computer exception articulated in *Katz*.  Instead of following the test articulated in *Katz*—that "functions [that] can be achieved by any general purpose computer without special programming" do not require an algorithm—the court instead utilized its own, novel test that was partially based on the "merely plugging in" standard from *Ergo*.  This Court should reverse the district court's holding because that court employed a standard that stands at odds with this Court's jurisprudence and gives inadequate deference to a person skilled in the art.

---

[10]  For this reason, this panel could rule in Appellant's favor by following *Katz* and circumscribing the "merely plugging in" language as dicta that does not modify the *Katz* exception.

**A. The District Court Held That The Functions In The '757 Patent Were Indefinite Because Those Functions Could Not Be Performed By "Merely Plugging In" A Commercially Available Computer With Commercially Available Software.**

The district court determined that the '757 Patent was invalid because it contained computer-implemented means-plus-function terms that failed to satisfy the algorithm requirement and whose functions fell outside of the *Katz* exception. (A24–27.)  To reach its conclusion, the district court applied a standard that is absent from *Katz* and finds only partial footing in *Ergo*: "The fact that neither a store-bought computer nor a store-bought computer with store-bought software could achieve the claimed function places this case outside of the *Katz* exception." (A29.)

The district court arrived at this standard by starting with *Katz*, noting that "it is 'not necessary to disclose more structure than the general purpose processor' when the claimed functions 'can be achieved by any general purpose computer without special programming.'" (A24 (quoting *Katz*, 639 F.3d at 1316).) However, the court then noted that *Ergo* qualified the rule: "This exception is a 'narrow' one, and an algorithm need not be disclosed 'only in the rare circumstances where any general-purpose computer without any special programming can perform the function.'"  (A24 (quoting *Ergo*, 673 F.3d at 1364–65).)  To demarcate functions that fall outside of the exception, the court favorably quoted the "merely plugging in" standard from *Ergo*: "By contrast [to

the functions listed in *Katz*], any function that involves 'more than merely plugging in a general-purpose computer' requires special programming." (A24 (quoting *Ergo*, 673 F.3d at 1365).)

Attempting to reconcile the *Katz* exception's use of the words "special programming" with the *Ergo* Court's use of a "merely plugging in" standard, the district court conceded that there must be a distinction between *some* programming and *special* programming. To draw the line between the two, however, the court stuck closely to the standard of "merely plugging in" a commercially available computer, allowing that computer to use commercially available software at the time of the invention:

> In my view, the proper distinction between "special programming" and "programming" is whether the programming in question is commercially available at the time of the invention. If the programming required to perform the claimed function can be purchased off-the-shelf, then it is ordinary programming and no algorithm is required to comply with § 112, ¶ 6's structure requirement. A general purpose computer is sufficient structure in this situation. If, however, a store-bought computer combined with off-the-shelf programming cannot perform the claimed function, then there is a need for special programming, and § 112, ¶ 6 therefore mandates the disclosure of an algorithm.

(A29.)

By reducing the *Katz* exception to what was commercially available, the court thus focused its attention on what a consumer could purchase in 1991,

reducing the role of a person skilled in the art in its inquiry to a retail archivist: "If the required programming is more sophisticated than what *can be readily purchased by a consumer*, then the algorithm must be disclosed as the quid pro quo for receiving patent protection." (A30 (emphasis added).) Attempting to then reconcile its newly created standard with the holding in *Katz*, the court retroactively applied its off-the-shelf framework to that case, reasoning that the *Katz* holding hinged on the functionality of off-the-shelf software: "Processing, receiving, storing, and displaying an icon are functions that any general purpose computer purchased off-the-shelf is capable of performing, which is why no algorithm is required." (A30.)

### B. Both The Algorithm Requirement And The *Katz* Exception Are Underpinned By The Viewpoint Of A Person Skilled In The Art And The Importance Of The Public-Notice Doctrine.

At its core, the algorithm requirement reflects this Court's concern that the public—defined as the population of persons skilled in the art—will not understand the bounds of a computer-implemented means-plus-function term that only discloses a microprocessor, because "general purpose computers can be programmed to perform very different tasks in very different ways." *Aristocrat*, 521 F.3d at 1333. Thus, without informing the public of what is happening inside the ominous "black box," there is a risk that a person skilled in the art would not understand the bounds of the claim because the disclosure of hardware alone risks

"not limit[ing] the scope of the claim" to a corresponding structure, as required by § 112 ¶ 6. *Id.*

The algorithm requirement presupposes that the structure of a computer-implemented means-plus-function term is more than hardware—that is, the microprocessor or computer executing the function. The structure is not the general-purpose computer alone, but a special-purpose computer executing an algorithm to perform the function: "a general purpose computer programmed to carry out a particular algorithm creates a 'new machine' because a general purpose computer 'in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.'" *Aristocrat*, 521 F.3d at 1333 (quoting *WMS Gaming*, 184 F.3d at 1348). Thus, "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather *the special purpose computer programmed to perform the disclosed algorithm.*" *WMS Gaming*, 184 F.3d at 1349 (emphasis added); *accord Net MoneyIN*, 545 F.3d at 1367; *Finisar*, 523 F.3d at 1340.

As the *Aristocrat* Court noted, "[t]he point of the [algorithm] requirement . . . is to avoid pure functional claiming." 521 F.3d at 1333; *see also Function Media*, 708 F.3d at 1318–19. Pure functional claiming fails to demarcate

the invention because it can capture any structure that performs the function; this lack of a definite boundary, in turn, evinces a failure of the patentee to shoulder the burden for receiving the benefit of means-plus-function claiming. *See id.*

Far from deviating from these underlying principles, the *Katz* exception reinforces them. The principles that animate § 112 ¶ 2 and ¶ 6 demonstrate why routine functions of a general-purpose computer should not trigger public-notice concerns: even *without* an algorithm in a specification that explains how to perform such functions, a person skilled in the computer arts—*e.g.,* an individual with a Bachelor of Science in computer science or electrical engineering and a few years of work experience—would know the bounds of an invention that claims, to take an example from *Katz*, a computer means for storing, because using a computer to store data is elementary and fundamental knowledge for such a person.

Thus, the public—which is to say other skilled artisans—need not be put on notice of the bounds of "storing" via an algorithm because the disclosure of hardware alone triggers the knowledge of a person skilled in the art, who understands based her knowledge *in the art* the bounds of "storing." As the *Katz* Court specifically noted, if a function can be achieved by a general-purpose computer, then the patentee has avoided pure functional claiming and satisfied the

quid pro quo requirement because a person skilled in the art would recognize the hardware as sufficient structure to perform the function. *See* 639 F.3d at 1317.

### C. The District Court's Standard Impermissibly Restricts The Role Of A Person Skilled In The Art.

By employing the standard of "merely plugging in" an "off-the-shelf" computer with "off-the-shelf" software from 1991, the district court departed from the controlling law. A thorough reading of *Katz* turns up no analysis demonstrating that the general-purpose computer exception should turn on what a consumer could purchase from a Circuit City shelf in 1991. *Cf. Katz*, 639 F.3d at 1316.[11] And, although Appellants obviously take a skeptical view of *Ergo*, even with its "merely plugging in" standard, that case provides little support for the notion that the demarcation between general- and special-purpose computers should turn on what a consumer could purchase at the time of the invention.

Of equal importance, the district court's inquiry ignores a person skilled in the art by depriving that hypothetical construct of the expansive education, work experience, and creativity that is inherent in the concept of one skilled in the art. *See supra* Part I.A.; *cf. Nautilus*, 134 S. Ct. at 2128; *KSR*, 550 U.S. at 421; *Typhoon Touch*, 659 F.3d at 1385; *AllVoice Computing*, 504 F.3d at 1242; *Creo*

---

[11] Appellant notes that *Noah Systems*, 675 F.3d 1302, contains references to "off-the-shelf software," but that case does so only in a thorough analysis of the specification's use of that specific term within the patent-at-issue there. *See id.* at 1316–18.

*Prods.*, 305 F.3d at 1347; *S3 Inc.*, 259 F.3d at 1371. Instead of supposing that a person is skilled in a particular field relative to a particular time, the district court's analysis reduces the construct to the viewpoint of an archivist whose only role is to locate data showing what was commercially available at the time of the invention. This impermissibly sets the standard at what a consumer from 1991 would know rather than what a skilled artisan would know. *See S3 Inc.*, 259 F.3d at 1371 (collecting cases) (reiterating that patents are written for skilled artisans, not the lay public). This is problematic, of course, because the touchstone for a definiteness inquiry is the viewpoint of a person skilled in the art. *Nautilus*, 134 S. Ct. at 2128. In this case, the district court applied a standard that largely preempts that standard.

**III.    PROPER APPLICATION OF THE *KATZ* EXCEPTION REQUIRES THE COURT, FROM THE VIEWPOINT OF A PERSON SKILLED IN THE ART, TO DIFFERENTIATE BETWEEN *SOME* PROGRAMMING THAT IS ROUTINE TO THE ART AND *SPECIAL* PROGRAMMING THAT, WITHOUT AN ALGORITHM, LEAVES THE BOUNDS OF THE INVENTION UNCLEAR.**

If a person skilled in the art understands the bounds of a computer-implemented means-plus-function term because the function in that term is elementary and the algorithm is well-known in the art, then it is immaterial whether *some* routine programming is required to implement that function. An algorithm should only be required if a person skilled in the art would have to employ programming beyond a basic, settled method known in the art, thus leaving the bounds of the term ambiguous.

## A. Proper Deference To The Vantage Point Of A Person Skilled In The Art Requires Recognition That "Special" Programming Is Not Coextensive With "Any" Programming.

The law supports EON's interpretation of the *Katz* exception. The touchstone of a definiteness inquiry is a person skilled in the art, with her requisite level of knowledge, experience, and creativity. *Nautilus*, 134 S. Ct. at 2128; *KSR*, 550 U.S. at 421. If she can understand the bounds of a patent claim based on that knowledge despite the lack of an algorithm, then the term cannot be indefinite. *See Creo Prods.*, 305 F.3d at 1347 ("[I]n addressing the question whether a means-plus-function limitation satisfies the definiteness requirement, we focus our inquiry on whether one skilled in the art would have understood that the specification of each patent disclosed structure capable of performing the function recited in the claim limitation."); *see also Nautilus*, 134 S. Ct. at 2128. As the Court noted in *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003):

> In past cases, we have been generous in finding something to be a corresponding structure when the specification contained a generic reference to structure *that would be known to those in the art* and that structure was clearly associated with performance of the claimed function. For example, . . . [t]here was no need for a disclosure of specific circuitry in [*Intel Corp. v. VIA Technologies, Inc.*, 319 F.3d 1357 (Fed. Cir. 2003)], just as here there would be no need for a disclosure of the specific program code if software were linked to the converting function and *one skilled in the art would know the kind of program to use*.

*Id.* at 1213–14 (emphasis added).

The algorithm requirement itself is predicated on a distinction between what was known in the art and *new* programming that added *novelty* to the art: "If a machine is programmed in a *certain new and unobvious way*, it is physically different from the machine without that program; its memory elements are differently arranged." *WMS Gaming*, 184 F.3d at 1348 (brackets and internal quotation marks omitted) (emphasis added) (quoting *In re Bernhart*, 417 F.2d 1395, 1399–1400 (C.C.P.A. 1969)). This distinction requires evidence of how a person skilled in the art would read the computer function at issue in the context of the overall invention: "the amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." *Typhoon Touch*, 659 F.3d at 1385.

Further, *Katz* itself contains support for differentiating between routine programming and special programming as determined by a person skilled in the art. The *Katz* Court reviewed a district court's finding that seven computer-implemented terms were indefinite. 639 F.3d at 1313. It held that four of the terms were indeed indefinite, including the computer-implemented term "based on a condition coupling an incoming call to the operator terminal." *Id.* at 1315. The Court specifically noted that the term described a complex function that could be

achieved in fundamentally different ways, leaving the public "to guess whether the claims cover only coupling based on particular system conditions, such as the availability of an operator, or are broad enough to cover any coupling in conjunction with an if-then statement in source code." *Id.* Accordingly, *special* programming was required to inform a person skilled in the art of the bounds of the invention.

By contrast, the Court found that—absent a more narrow construction on remand—three of the terms at issue were not indefinite and met the requirements of § 112 ¶ 6 because the functions in those terms could be accomplished by a general-purpose computer without special programming. These included the functions of processing, receiving, and storing. *Id.* at 1316. Significantly, the *Katz* Court did not distinguish between functions achievable by off-the-shelf products. Rather, the Court leaves open the question of what "special programming" means given the state of the art at the time of the invention. By doing so, the *Katz* Court remains true to the proper standards of claim interpretation from the vantage point of a person skilled in the art at the time of the invention.

A recent application of the *Katz* exception by the District Court for the District of Nevada illustrates the necessity for differentiating *special* programming from *any* programming. In *Elan Microelectronics Corp. v. Pixcir Microelectronics Co.*, No. 2:10-cv-00014, 2013 WL 2394358 (D. Nev. May 30, 2013), decided after

*Ergo*, the patent-at-issue required a microprocessor to calculate the distance between two points as part of a larger computer-implemented function. Even though the patentee conceded that the patent contained no algorithm, the court found that the function could be performed by a general-purpose computer, agreeing with the patentee's assessment that a person skilled in the art would understand the "basic" function of using a computer to calculate the distance between two points. *Id.* at *24.

Indeed, the Nevada court's common-sense ruling echoes the principles governing definiteness queries discussed above—a person skilled in the computer arts simply does not need to be given the Pythagorean theorem to understand the bounds of that claim because the Pythagorean theorem is well-known in the art (indeed, few things in the mathematics arts could be older), and using source code to implement that well-known algorithm is elementary. To frame the issue less elegantly, it would be absurd to invalidate a patent on the grounds that a person with a computer science degree and years of industry experience would be at a loss for understanding without having the Pythagorean theorem explicitly recited in the patent's specification. *Cf. S3 Inc.*, 259 F.3d at 1371 (noting that patents need not contain "a technical treatise for *the unskilled reader*" and that "'[p]atents are written to enable those skilled in the art to practice the invention, *not the public*'"

(emphasis added) (quoting *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed. Cir. 1983))).[12]

## B. EON's Position Below Was Consistent With The Law.

Pursuant to this interpretation of the law, EON's position below—that the district court rejected—was clear: the bounds of the computer-implemented means-plus-function terms in the '757 were definite because a person skilled in the art would understand the structure of those terms as the microprocessor disclosed in the '757 Patent and a routine, well-settled method within the art that even a person of elementary skill would understand and could implement. Thus, EON took the position that there existed *some* programming, the boundaries of which were clear and definite in the eyes of a person skilled in the art, that did not rise to *special* programming. This led EON to argue, as it does here, that the bounds of the computer-implemented functions in the '757 were definite because a person skilled in the art—given her knowledge, work experience, and creativity, as the law demands—would understand the bounds of the claims.

---

[12] *Elan* also serves as a concrete example of the concern that the *Ergo* test, taken to its extreme, could "add[] grievous unreliability to duly granted patents" by "finding standard presentations now to be fatally deficient." *Ergo*, 673 F.3d at 1369 (Newman, J. dissenting). Indeed, under the "merely plugging in" standard, the function-at-issue in *Elan* would likely be indefinite because there exists no "Pythagorean theorem" function that an off-the-shelf computer could execute upon being plugged in.

From that perspective, programming to implement the general-purpose computer functions at issue in this case is not "special" programming. As Dr. Sauer testified, such programming in the eyes of a person skilled in the art would be "very basic," "routine," and "elementary." (A467:16, A469:21; *see also* A457.) Further, Dr. Sauer noted that each of the computer-implemented means-plus-function terms at issue in the '757 Patent required no more than "basic, routine" work from "an entry-level computer programmer in 1991" using commercially available hardware and software. (A469:21.) Finally, Dr. Sauer testified that despite the idiosyncrasies of different programmers regarding how they actually coded, "there would be a normal, standard way" that a person skilled in the art would understand and implement each of the functions at issue. (A469:21.)

By contrast, Appellees' expert, Dr. Grimes, focused not on the knowledge and understanding of a person skilled in the art, but instead on whether *any* programming was required: "I think special programming means *any* programming that would be added to a general-purpose computer to make it perform the required functions." (A487 (emphasis added).) Further, Appellees invited the district court to reject the nuance in the law EON suggests here and urged the court to adopt the "merely plugging in" standard from *Ergo*. For the reasons above, that position is simply untenable.

## C. EON's Proposed Distinction Between *Some* Programming and *Special* Programming Is Consistent With This Court's Jurisprudence.

Appellees will no doubt contend that the Court should reject EON's proposed distinction between *some* programming that is routine and *special* programming. Appellees may argue that Appellant's emphasis on the viewpoint of a person skilled in the art is largely superfluous because this Court has repeatedly noted that if no algorithm exists, the opinion of a person skilled in the art does not matter:

> In *Medical Instrumentation*, we held that the proper inquiry for purposes of section 112 paragraph 6 analysis is to "look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software [to perform the function] and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program." We then stated that it is "not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent."

*Aristocrat*, 521 F.3d at 1337 (emphasis added) (citations omitted) (brackets in original) (quoting *Med. Instr.*, 344 F.3d at 1212; *see also Function Media*, 708 F.3d at 1318; *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005).

This argument is misdirected. First, as Appellant notes above, this Court's jurisprudence regarding computer-implemented terms turns on the rejection of a

hardware-only structure for such terms vis-à-vis a special-purpose computer comprised of hardware executing an algorithm. *See, e.g.*, *WMS Gaming*, 184 F.3d at 1349. As this Court has noted, a person skilled in the art may supplement the disclosures in the patent with her own knowledge if *some* structure exists. *See Creo Prods.*, 305 F.3d at 1347 ("[K]nowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness."). Thus, if a computer-implemented term contains a function that is well-known in the art, a person skilled in the art might recognize the bounds of the claim as a combination of the hardware explicitly disclosed in the patent and as the well-settled, elementary algorithm that exists in the art.

The cases that define algorithms as the *only* form of sufficient structure that can satisfy the requirements of § 112 ¶ 6 are inapplicable here because they address the question of whether there is sufficient structure to achieve the function after it has *already been determined* that an algorithm is necessary.[13] By contrast, the *Katz* Court asks a question prior to that determination—is an algorithm

---

[13] *E.g.*, *Aristocrat*, 521 F.3d at 1333 ("the corresponding structure . . . for a computer-implemented function *is the algorithm* disclosed in the specification" (internal quotation marks and alteration removed) (quoting *Harris Corp.*, 417 F.3d at 1249)).

necessary at all—and recognizes that hardware can be *some* structure.[14]  *See Katz*, 639 F.3d at 1316.  Hence, the Court in *Noah Systems*, before proceeding with its analysis based on the *Aristocrat* line of cases and the total absence of an algorithm, noted that it was proceeding with the understanding that the claims before it did not fall within the *Katz* exception.  675 F.3d at 1312 n.8.

Second, the argument is wholly inconsistent with *Nautilus*: the touchstone of a definiteness determination is the viewpoint of a person skilled in the art, full stop. *See* 134 S. Ct. at 2124.  If a person skilled in the art understands the bounds of the claim, even without an algorithm, then the claim simply cannot be indefinite. Third, the *Katz* exception itself pushes back against this argument: those functions that fall within the functionality of a general-purpose computer do not require an algorithm because a person skilled in the art would associate the hardware as sufficient structure to perform the function.  639 F.3d at 1316.

Appellees may also argue that the Court should err on the side of requiring an algorithm because computers "can be programmed to perform very different

---

[14] For these reasons, the concerns expressed in *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946 (Fed. Cir. 2007), would likewise be inapplicable. *See id.* at 953 ("[A] bare statement that known techniques or methods can be used does not disclose structure.  To conclude otherwise would vitiate the language of the statute requiring 'corresponding structure, material, or acts described in the specification.'").  Further, as Dr. Sauer's testimony demonstrates, he makes more than a "bare statement," explaining *how* a person skilled in the art would understand *and* implement the functions, and connects those functions to structure in the '757 Patent's specification.

tasks in very different ways," thus triggering the Court's concern about unbounded, pure functional claiming. *See Aristocrat*, 521 F.3d at 1333; *see also Blackboard*, 574 F.3d at 1384 (noting that patentees are barred from "claim[ing] all possible means of achieving a function"). In this argument, echoed by the *Ergo* Court, Appellees might argue that the *Aristocrat* Court itself noted that "appropriate programming" offered no bounds on a claim because the term "simply references a computer that is programmed so that it performs the function in question, which is to say that the function is performed by a computer that is capable of performing the function." *Id.* at 1334.

The Court should reject this argument for two reasons. First, as Appellants have argued throughout this Brief, if a person skilled in the art recognizes the structure in the patent as sufficient—even if that structure is hardware without a corresponding algorithm—then the inquiry ends and the claim cannot be indefinite. Arguing that the Court owes fidelity to the algorithm requirement even where a person skilled in the art would understand the bounds of the invention simply misapprehends the scope of the algorithm requirement and its purposes. Second, as Appellant's expert Dr. Sauer testified, a person skilled in the art would utilize routine, settled algorithms known in the art to implement the functions at issue in this case. In this regard, the Court should be mindful of the distinction between the amount of specificity required for a person skilled in the art *to understand* the

bounds of a claim, and the latitude that is given to that person to actually enable the invention: "structure for a section 112(f) claim limitation[] need not be so particularized as to eliminate the need for *any implementation choices* by a skilled artisan." *See Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013) (emphasis added). In short, mundane tasks that require mundane programming should not trigger the concern that patentees are violating their quid pro quo requirements by claiming boundless functions; as Dr. Sauer testified, persons skilled in the art would execute the routine computer functions at issue in this case in rote ways.

Relatedly, Appellees may argue, as they did below, that both parties' experts conceded that multiple ways existed to program even the most basic computer functions because persons skilled in the art have their own idiosyncrasies regarding programming. (A519–20.) But, as EON argues above, that argument fails to address that, as Dr. Sauer testified, the *methods* that a person skilled in the art would understand in reading the patent were elementary, settled ways of performing the functions. Even if more than one simple, elementary method existed, if it is known in the art, then it is not grounds for a finding of indefiniteness: "That the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art." *Linear Tech. Corp. v. Impala*

-55-

*Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004). As Dr. Sauer testified, the classes of functions required in the '757 Patent, like displaying a menu, are readily identifiable to a person skilled in the art. In addition, the argument ignores the enablement theory that persons skilled in the art are to be given leeway in their implementation choices. *See Ibormeith*, 732 F.3d at 1379. Thus, the mere fact that there is variation in methods for computer programming does not imply that the function being claimed is a runaway, purely functional claim.

Finally, Appellees may argue that this Court has repeatedly held that the definiteness inquiry turns on what a person skilled in the art would understand regarding the bounds of the claim, not whether that person "may find a way to practice the invention." *See, e.g.*, *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2012). Dr. Sauer's testimony, however, satisfies both requirements, as he testified from the "understanding [that] we're here to *understand* these in terms *in the context* of the '757 patent, *by a person of skill in 1991*." (A467:15 (emphasis added).) Further, Dr. Sauer's testimony was in response to questions like, "And in your opinion how would a person of skill in the art in 1991 *understand* that term?" and "Could a person of ordinary skill in the art *understand* how to do that?" (A467:15, 470:26 (emphasis added).) That Dr. Sauer also testified about the capabilities of general-purpose computers and what would be required for such a computer to perform the functions-at-issue in the '757 does

not foreclose his testimony about *the understanding* of those terms by a person skilled in the art in 1991. After all, the *Katz* exception invites testimony regarding the capabilities of a general-purpose computer and how a person skilled in the art would understand that machine.

## CONCLUSION

The *Katz* Court held that "functions [that] can be achieved by any general purpose computer *without special programming*" do not require an algorithm to comply with the provisions of § 112 ¶ 6 and are definite under § 112 ¶ 2. 639 F.3d at 1316 (emphasis added). This Court should hold that the general-purpose computer exception to the algorithm requirement includes functions that a person skilled in the art would understand a general-purpose computer capable of performing, regardless of whether that function requires elementary programming. In order to accomplish this task, this Court should rule that "special" programming in the *Katz* test is distinct from routine programming that is settled in the art. Specifically, if a person skilled in the art at the time of the patent, reading a claim term in light of the specification, its prior history, and the art itself, determines that a computer-implemented function may be performed by a general-purpose computer utilizing settled, elementary programming known in the art, then that claim term should be definite because a person skilled in the art would understand

the bounds of the claim.  Accordingly, the judgment of the district court should be reversed.

Respectfully submitted,

___ /s/  John L. Hendricks ___

JOHN L. HENDRICKS
DANIEL SCARDINO
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792

*Counsel for Plaintiff–Appellant*

July 2, 2014

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

### <u>PATENT-IN-SUIT</u>

U.S. Patent No. 5,663,757......................................................................................A1

### <u>JUDGMENTS AND ORDERS APPEALED FROM</u>

Memorandum Opinion Construing Terms of March 4, 2014...............................A18

Order Granting Defendants' Motion for Summary Judgment
    of March 4, 2014........................................................................................A41

Judgment of March 5, 2014 ...............................................................................A42

Joint Stipulated Final Judgment of March 18, 2014...........................................A46

# United States Patent [19]

## Morales

[11] **Patent Number:** 5,663,757

[45] **Date of Patent:** Sep. 2, 1997

[54] **SOFTWARE CONTROLLED MULTI-MODE INTERACTIVE TV SYSTEMS**

[76] Inventor: **Fernando Morales**, 1941 Roland Clarke Pl., Reston, Va. 22091

[21] Appl. No.: **674,169**

[22] Filed: **Mar. 25, 1991**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 379,921, Jul. 14, 1989, Pat. No. 5,036,389, and a continuation-in-part of Ser. No. 390, 073, Aug. 7, 1989, Pat. No. 5,101,267.

[51] Int. Cl.$^6$ ...................................................... H04N 7/14
[52] U.S. Cl. ............................... 348/13; 455/2; 455/6.2
[58] Field of Search ........................ 358/84, 86; 455/3.2, 455/4.1, 4.2, 5.1, 6.1, 6.3; 348/1, 13, 10

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,506,383 | 3/1985 | McGann | 455/17 |
| 4,591,906 | 5/1986 | Morales-Garza et al. | 358/84 |
| 4,630,108 | 12/1986 | Gomersall | 358/84 |
| 4,750,036 | 6/1988 | Martinez | 348/4 |
| 4,897,714 | 1/1990 | Ichise et al. | 455/5.1 X |
| 4,926,256 | 5/1990 | Nanba | 358/84 |
| 4,945,563 | 7/1990 | Horton et al. | 358/84 |
| 5,041,972 | 8/1991 | Frost | 358/84 |
| 5,051,822 | 9/1991 | Rhoades | 358/86 |
| 5,237,688 | 8/1993 | Calvert et al. | 395/700 |
| 5,327,554 | 7/1994 | Palazzi, III et al. | 348/13 |

Primary Examiner—Edward F. Urban
Attorney, Agent, or Firm—Laurence R. Brown

[57] **ABSTRACT**

A wide range interactive two way communication video system operable nation-wide over satellite links has comprehensive local data processing stations for network subscribers that give a wide range of choices for customizing system features. In particular the system is soft-ware controlled by a programmable computer that comprehensively interconnects one or more interactive features or modes of operation in a local subscriber's unit that may be licensed to or chosen by individual subscribers. Such optionally selected features include data bases, audience response, instantaneous purchase and billing, channel and program selections, restructuring of system operation, and video games. Multiple slot software capability for receiving chips, discs or other software storage units are provided for customizing data bases, fiscal transactions, access to network facilities and remote stations, operational menus and program selection menus from broadcast, and cable or satellite communications. Subscriber participation is done from an armchair by flicking a finger without interrupting the viewing of program materials, without telephone lines or writing implements. A typical interactive transaction would be instantaneous response to an advertisement in a video broadcast program with a purchase decision which orders a product or service, pays, ships and reorders into inventory the product at different local sites in far-off cities.

**10 Claims, 5 Drawing Sheets**





*FIG. 1*



*FIG. 2*



FIG. 3



*FIG. 4*



*FIG. 5*

5,663,757

# 1

## SOFTWARE CONTROLLED MULTI-MODE INTERACTIVE TV SYSTEMS

This is a continuation in part of my applications Ser. No. 07/379,921 filed Jul. 14, 1989 for Satellite Controlled Audience Polling System now U.S. Pat. No. 5,036,389, Jul. 30, 1991 and Ser. No. 07/390,073 filed Aug. 7, 1989 for Wireless Communication from the Response Unit to a National Central Location now U.S. Pat. No. 5,101,267, Mar. 31, 1992.

## FIELD OF THE INVENTION

This invention relates to television systems and more particularly it relates to two-way communicating interactive television systems which permit user intervention and participation.

## BACKGROUND OF THE INVENTION

Audience participation television systems with two way communication are well known. Exemplary is U.S. Pat. No. 4,591,906, May 27, 1986 for Wireless Transmission from the Television Set to the Television Station. This system provides for instantaneous audience response to questions contained in television program pictures that may be processed from very large audiences of millions of subscribers on line in real time at a central processing station, typically at a TV transmitter station. Provisions were made for identifying each of about 29 million individual subscribers with narrow band unmodulated r–f beep signals within the range of a television broadcast signal so that this system is well adapted for a large city environment.

In the above identified co-pending applications, herein contained in entirety by reference, the local TV station transmission area audience participation was extended nationwide by means of processing audience response signals over satellite links. This was possible because there was no need to store and recall data, and no telephone lines were used with their system switching and limited peak load capacity bottlenecks, making them incapable of processing a nationwide audience instantaneously. Thus on-line real-time audience responses to polls with instantaneous nationwide audience surveys are made possible. These systems also are most advantageous in providing armchair responses without interruption to viewing of a program so that impulse voting and purchase decisions without afterthought are made feasible. This was achieved by means of a remote controlled cursor positioning control unit that positioned the cursor at a particular voting position on a television picture screen menu format. Computers at the local response units were operable to precisely define, time and transmit answers and to process therewith such other information as subscriber identification. The remote control units were further used for other functions such as channel switching, VCR unit operation and manipulation of television set controls such as loudness, etc.

Prior art audience participation systems in general were single purpose systems in that they controlled data such as votes in response to polls or kept TV set operating history for periodic billing purposes However, occasionally an auxiliary audience interactive feature was provided such as playing of video games, as shown in U. S. Pat. No. 4,630,108 for Preprogrammed Over-the-air Marketing Research System, Dec. 16, 1986, E. R. Gomersall. However in such systems, any satellite communication features were limited to conventional broadcast of TV programs, and telephone systems were necessary to relay stale stored participation and operation data off-line.

# 2

Thus such prior art systems have not been able to provide either real time instantaneous purchases, voting, communication or comprehensive interactive by audiences.

Furthermore prior art systems have not been versatile enough to provide customized participation features for the particular interests and financial capacities of a wide range of subscribers.

Accordingly it is a general objective of this invention to provide improved comprehensive interactive TV systems having instantaneous on-line nationwide communication capabilities.

It is a further object of the invention to provide customized interactive TV systems providing a variety of optional features for manual control of a subscriber and a choice of system features.

## DISCLOSURE OF THE INVENTION

In accordance with this invention a local data processing station of a network subscriber controls video signals, local system operational modes and interactive communications of a range of participating activities available for subscriber interaction. Thus, a television receiver with program control means and channel selection means has a remote control unit for manual control and interaction with the network and television receiver from an armchair position without diverting attention away from the TV video display screen upon which programs are viewed as well as selection menus for audience participation voting, selection of system functions and program options, etc.

A programmable computer is interconnected with the local subscriber station TV receiver and the computer program control means comprises software computer program control means, preferably in the form of replaceable data storage units such as read only memory chips, thereby to establish a variety of communication and program options available to the subscriber for interactive control and participation in a way the licensing and charging is easily administered.

Radio wave transmission means for sending and receiving information over the network provides for satellite communication of instantaneous response communications in digital form in narrow band r–f wave beep digital signal format transmitted as audience response signals over a satellite communication channel to a nationwide audience in such a manner that many millions of participants can participate instantaneously without intermediate storage of data or responses or waits and bottlenecks that discourage participation.

Thus, a network of interconnected interactive communication stations and local viewing options are interconnected for instant armchair control and accessibility to the limited extent permitted by restrictive software programming of local computer controlled system configuration at the subscriber's local stations. The interaction and control is related to various system configurations and modes of operation and corresponding menu displays on the video screen for expediting manual control by placing a cursor at a selected option on a menu displayed on the video screen.

Accordingly a wide range of optional operational modes and interaction functions are available on a subscription basis to match the interests ahd finances of the individual subscribers. Included in the interactive participation features available from this system are features such as instantaneous impulse purchase transactions with immediate payment, delivery, bookkeeping, inventory control and restocking at various locations over the nation, all automatically initiated

5,663,757

| 3 | 4 |

with a flick of a finger from an armchair viewing position without interruption of attention from the TV video screen. The purchaser may be identified and a credit card or bank transaction completed electronically without intervening voice or written communication. Similarly video games may be played, data banks accessed, programs selected, historical operation of the TV set recorded, available current program availabilities consulted, VCRs controlled and various other interactive participation and system features now available and offered in the future offered for optional control by audience participation.

Further objects, features and advantages of the invention will be found throughout the following more detailed description of a preferred embodiment of the invention and its manner of construction as well as the accompanying drawings and claims.

BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings wherein like reference characters represent similar features, and primed reference characters indicate variations in the features, throughout the several views:

FIG. 1 is a block diagram of a wide area TV audience response system afforded by the invention.

FIG. 2 is a block diagram of a local response unit station at a subscriber's location for audience response by means of cursor positioning On the TV video display screen,

FIG. 3 is a further local response unit subscriber station block diagram illustrating customized control of interaction features by means of software program and system control means,

FIG. 4 is a block diagram in more detail of the software control system afforded by this invention, and

FIG. 5 is a functional operation diagram illustrating typical customized control of interactive features by means of computer programming software in accordance with this invention.

THE PREFERRED EMBODIMENT

In operation of the customized interactive video subscriber's stations afforded by this invention, nationwide two-way communication networks are afforded by means of satellite communications identified in FIG. 1, and more fully disclosed in the aforesaid parent applications. Thus a family of local subscriber's units or stations 4 communicate with a local area repeater station 3 over a narrow band 128 MHz r–f wave link in the manner identified in the aforementioned U.S. Pat. No. 4,591,906. One or more local area repeater stations 3 then are linked via satellite 1 and directional antennas 1A, 3A and 2F to the remote station, here identified as audience response data center 2, at which audience responses nationwide may be assembled and retransmitted nationwide instantaneously in response to queries implicitly contained in program materials, for example. This network of interacting subscriber stations is characterized by two-way communication capabilities, wherein each subscriber nation-wide is identified individually for fiscal charges or audience analysis purposes. The audience response may be an answer to a poll question or a purchase of an advertised item.

At the local subscriber's unit, some of the system and local interaction features are illustrated in FIG. 2. Note the two parallel communication means, namely, (1) the antenna 5A for the responsive beeps or equivalent communications initiated by subscriber manual control, and (2) the TV antenna 5C or equivalent cable system that provides a plurality of program channel choices for the local TV receiver 5F and input messages from the network carried on existing programming materials. Thus, responses may be simultaneously transmitted from the answering device 5B while the TV screen is being viewed without interruption, phone calls or moving from an armchair viewing site by means of the remote control device 12, which as shown intercommunicates by means if infrared (I.R.) wireless links with the answering device 5B, the TV receiver 5F, the V.C.R. 8D and other interactive system units or control centers. The answering device may be that described in the U.S. Pat. 4,591,906, for example.

The remote control unit 12 is operable in accordance with this invention to control the position and function of a cursor 6 on the video viewing screen 11, such as by means of a joystick control member 13. A decision, vote or purchase may be made and recorded by means of the selection pushbutton switch 15. Thus when the menu displayed on screen 11 from another subscriber in the form of an advertisement in a regularly programmed video program or otherwise, the cursor 6 is positioned at a video screen selection site and a transaction made by means of subscriber controlled manual control means 12 and its joystick 13 and selector 15. Various active menus may be locally generated together with local system operating modes for interaction as explained in more detail hereinafter.

The splitter 5E, or other equivalent switching means, provides a choice of programs and local system units such as disc players (not shown) for independent use or selection on the TV receiver 5F by its conventional tuning means, with or without the aid of the keyboard on remote control unit 12.

In accordance with this invention, as better seen by reference to FIG. 3, a wide range of subscriber interaction, participation and control is made feasible by the software (8) controlled programmable microprocessor data processing system 27, which is later shown in more detail. The software controlled computer data processing system comprises a computer directed control system providing local station organization and operation in different operating modes. Thus such customized interactive features as network communication, menu selections, program viewing options including channel selections, processing of bank and fiscal transactions with credit and payment for purchases, audience response, data processing from data banks and local historical records with the video screen serving as the computer monitor, and a wide variety of other interactive functions useful to a local subscriber can be supplied from a standard low cost facility by means of software control.

This software control feature systemwise permits the use of a software disk, chip or card to define and customize those licensed activities that individual subscribers order. It can identify the subscriber, a bank account or credit card that permits instant purchase transactions completed on impulse instantaneously without moving from an armchair, writing or telephoning. It can organize a computer controlled local system into many different configurations and modes of operation so that a wider range of interactivity by the subscriber is made affordable with standardized but highly flexible low cost equipment.

Returning to the details of the system of FIG. 3, generally identified as the 5B answering device, the parallel nature of the program sources 5C' and the two-way communications through the audience processing channel 25 is shorn as communicating with the response unit control system and

5,663,757

| 5 | 6 |

microprocessor 27. Local video text for menus 11, such as shown on the Video screen are generated in NTSC format for U.S. standard television receivers at 25 and presented by way of modulator 26 on a selected interactive television processing channel to which the television receiver 10 and remote control unit 12 is responsive, such as channel four. Thus, this invention provides, for at least specified modes of operation, menus for interactive choices of the subscriber by means of location of a cursor at a menu choice location.

This particular menu presents a universal format for selecting television network programs without identification of local channel numbers, for example, which can change from county to county on separate cable systems or with local cities with radio wave broadcast from different channels. Thus, an interactive feature of this invention is the provision of channel selection as one of the interactive modes of operation. In this particular illustrated menu version of channel selection, it may be seen for example that an out of town visitor in a hotel does not know what local channel is allocated to CNN or what cable channel is allocated to HBO. Thus those channels may be selected simply and without reference to a channel guide by locating a cursor at the appropriate menu position and operating selection switch 15 for automatic system selection of that channel. The coordinates on screen 7 are shown to identify nine different menu zones available in this embodiment.

The channel selection feature is shown in more detail in FIG. 4 illustrating the relationship of the cursor control technique feature unique in this interactive television system and its interaction with the channel selection function. The control system block 27 (FIG. 3) is also related to the radio frequency beep transmitter 30 for network communication from the local subscriber station. Note that the software item P.R.O.M. 31 read only memory card or unit identifies the subscriber uniquely in the network beep signals. Also note that external software 8' has a plurality of slots 7A, 7N provided for receiving memory cards or discs that appropriately control the microprocessor 35 for organizing the control of the system, and the accessibility to the system by the subscriber based upon contract provisions or payment schedules, etc. Some software storage units 7 can be random access (R.A.M.) and some may be read only (R.O.M.). The latter could be used for compiling historical data for audience analysis or billing purposes, for example. The R.O.M. units would include credit and banking restrictions for purchases or other fiscal transactions. Any restricted access features that involve costs or charges or license fees, etc. are thus controlled. Also this provides a medium by which the entire system configuration based upon the computer control system can be dynamically reconfigured from time to time to add or change features and to introduce new menus. This software-computer control configuration then truly provides a unique and versatile customizable interactive television system.

Incoming program signals at line 33 can carry return signals from the two-way communication capabilities of this system in the form of queries or other communications identifiable to flag audience response polls, etc. In general all timing is synchronized at 34 with the video sync signals to assure that cursor timing 39 and positioning on a picture raster is coordinated with the questions asked on the program picture, etc. Data detector 36,then processes the digital beep signals either implicit in the picture video or separately available at the query select means 37, which might for example be confined to particular incoming channels. The channel selector 41 is controlled by the microprocessor controlled control system such as by means of a software program for microprocessor

Functional operational features for customizing the interaction facilities and programs for the subscriber are set out in the block diagram configuration of FIG. 5, as related to the menu 11'. This menu comprises a program selection menu, where programs relating to various themes may be selected, based upon stored information, that may be updated daily for example, about the times that scheduled concerts, games, movies, etc. are available. Thus, for example the optional choice of any box would bring up a more detailed menu for selection of an available channel, program or feature, either instantaneously or at the future time it appears, with the possibility of recording it on a VCR. The "store " option for example may include catalog shopping features from several commercial subscribers.

The interaction between the software programs 8', the microprocessor 35 and system switching controls 40 to implement various operating modes 41 is illustrated. Thus for example video games such as chess, etc. may be played, a data base may be viewed or read, direct line banking transactions initiated, and the like. A basic system, for example, could provide audience response, purchase transaction and program selection modes of operation, with other features and system access being available at extra cost and configured only by means of special unexpired software storage unit which could be employed in one or more of the slots (FIG. 4).

Having therefore improved the nature of the art by providing a customized interactive video system with nationwide two-way communication capabilities, those features of novelty defining the spirit and nature of this invention are defined with particularity in the following claims.

I claim:

1. A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

5,663,757

7

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

replaceable software means located at the subscriber station for storing at least one replaceable software control program defining authorized operating conditions for that station, and operating means for programming said computer with said software control program to establish optional operating mode conditions authorized to said subscriber at the local data processing station as defined by the software control program.

2. The local data processing station as defined in claim 1 further comprising interactive selection means for establishing optionally a set of selectable interactive operation features identified by software programs stored on said replaceable software means.

3. The local data processing station as defined in claim 2 wherein at least one replaceable software program comprises a stored data base accessible for viewing on said video display screen in response to said subscriber manual control means.

4. The local data processing station as defined in claim 2 wherein at least one replaceable software program authorizes a video game for display on said video display screen.

5. The local data processing station as defined in claim 2 wherein the interactive selection means further comprises means for operating the system in a manual control purchase authorization mode for authorizing purchases in response to data displayed upon said video display screen, wherein at least one replaceable software means comprises credit authorization data for payment for purchases authorized by said manual control purchase authorization means.

6. The local data processing station as defined in claim 5 further comprising means operable under control of said replaceable software means and said operation control system for network interconnection to place and confirm an order in the purchase authorization mode with a remote station coupled into said network of interactive subscriber stations in response to said manual control purchase authorization.

7. The local data processing station as defined in claim 6 further comprising means under control of said replaceable software means for indicating acknowledging of shipment of an order from a remote station coupled into said network of interactive subscriber stations in real time in response to a manual control purchase authorization transaction at said local subscriber's station.

8. A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual

8

presentation on said display screen in response to operator control by way of paid operation control system,

a programmable computer interconnected with said television receiver and said operation control system.

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels wherein a channel selection menu identifying authorized channels is displayed automatically on said video screen.

means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels and means for causing selected themes to automatically display a second menu displaying available television programs relating to that selected theme, means responsive to said subscriber manual control means for selecting a preferred theme from said different themes presented when said first menu is displayed on said screen, and means in said control system for identifying on said second menu said television programs available relating to the selected theme.

9. A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system.

5,663,757

**9**

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station.

**10.** A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

**10**

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized by means of said software programs,

means controlled by replaceable software means operable with said operator control system for establishing and controlling fiscal transactions with a further local station in said network of interactive communications, and means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station.

* * * * *


(12) **EX PARTE REEXAMINATION CERTIFICATE** (9180th)

# United States Patent

Morales

(10) **Number:** US 5,663,757 C1

(45) **Certificate Issued:** Aug. 14, 2012

(54) **SOFTWARE CONTROLLED MULTI-MODE INTERACTIVE TV SYSTEMS**

(75) Inventor: **Fernando Morales**, Reston, VA (US)

(73) Assignee: **EON Corporation**, Tyler, TX (US)

**Reexamination Request:**
No. 90/011,695, May 17, 2011

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **5,663,757** |
| Issued: | **Sep. 2, 1997** |
| Appl. No.: | **07/674,169** |
| Filed: | **Mar. 25, 1991** |

### Related U.S. Application Data

(63) Continuation-in-part of application No. 07/390,073, filed on Aug. 7, 1989, now Pat. No. 5,101,267, and a continuation-in-part of application No. 07/379,921, filed on Jul. 14, 1989, now Pat. No. 5,036,389.

(51) **Int. Cl.**
*H04N 7/14* (2006.01)

(52) **U.S. Cl.** .................. 725/5; 348/E7.07; 348/E7.019; 348/E7.033; 348/E7.034; 725/22; 725/24; 725/40; 725/45; 725/56; 725/60; 725/65

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,695, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Joshua Campbell

(57) **ABSTRACT**

A wide range interactive two way communication video system operable nation-wide over satellite links has comprehensive local data processing stations for network subscribers that give a wide range of choices for customizing system features. In particular the system is soft-ware controlled by a programmable computer that comprehensively interconnects one or more interactive features or modes of operation in a local subscriber's unit that may be licensed to or chosen by individual subscribers. Such optionally selected features include data bases, audience response, instantaneous purchase and billing, channel and program selections, restructuring of system operation, and video games. Multiple slot software storage units are provided for customizing data bases, fiscal transactions, access to network facilities and remote stations, operational menus and program selection menus from broadcast, and cable or satellite communications. Subscriber participation is done from an armchair by flicking a finger without interrupting the viewing of program materials, without telephone lines or writing implements. A typical interactive transaction would be instantaneous response to an advertisement in a video broadcast program with a purchase decision which orders a product or service, pays, ships and reorders into inventory the product at different local sites in far-off cities.



US 5,663,757 C1

1

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1** and **7-10** are determined to be patentable as amended.

Claim **2-6**, dependent on an amended claim, are determined to be patentable.

1. A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

replaceable software means located at the subscriber station for storing at least one replaceable software control

2

program defining authorized operating conditions for that station, and operating means for programming said computer with said software control program to establish optional operating mode conditions authorized to said subscriber at the local data processing station as defined by the software control program, *and*

*means controlled by said replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus.*

7. [The local data processing station as defined in claim **6** further comprising] *A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,*

*an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,*

*a television receiver with a video display screen, program control means and television program channel selection means,*

*a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,*

*a programmable computer interconnected with said television receiver and said operation control system,*

*radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,*

*said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,*

*subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,*

*monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,*

*self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,*

*replaceable software means located at the subscriber station for storing at least one replaceable software control program defining authorized operating conditions for that station, and operating means for programming said computer with said software control program to establish optional operating mode conditions authorized to said subscriber at the local data processing station as defined by the software control program,*

*interactive selection means for establishing optionally a set of selectable interactive operation features identi-*

**3**

*fied by software programs stored on said replaceable software means, wherein the interactive selection means further comprises means for operating the system in a manual control purchase authorization mode for authorizing purchases in response to data displayed upon said video display screen, wherein at least one replaceable software means comprises credit authorization data for payment for purchases authorized by said manual control purchase authorization means,*

*means operable under control of said replaceable software means and said operation control system for network interconnection to place and confirm an order in the purchase authorization mode with a remote station coupled into said network of interactive subscriber stations in response to said manual control purchase authorization, and*

means under control of said replaceable software means for indicating acknowledging of shipment of an order from a remote station coupled into said network of interactive subscriber stations in real time in response to a manual control purchase authorization transaction at said local subscriber's station.

**8.** A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of paid operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

**4**

means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels wherein a channel selection menu identifying authorized channels is displayed automatically on said video screen,

means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels and means for causing selected themes to automatically display a second menu displaying available television programs relating to that selected theme, means responsive to said subscriber manual control means for selecting a preferred theme from said different themes presented when said first menu is displayed on said screen, and means in said control system for identifying on said second menu said television programs available relating to the selected theme, *and*

*means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus.*

**9.** A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized to the subscriber for controlling the local station options by means of said software programs,

US 5,663,757 C1

| 5 | 6 |

means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station, *and reconfiguring the operating modes by adding or changing features and introducing new menus*.

**10**. A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,

an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,

a television receiver with a video display screen, program control means and television program channel selection means,

a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of said operation control system,

a programmable computer interconnected with said television receiver and said operation control system,

radio wave transmission and reception means for sending and receiving video and interactive control signal information wirelessly to and from the subscriber television receiver stations in said network including messages with subscriber identification, video text and control signals for said television receiver,

said operation control system providing local station organization and operation in different operating modes permitting various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes,

subscriber manual control means for interactive participation and operation of said operation control system over an authorized range of optional features,

monitoring means for generating video displays of instructions and interactive menus on said video screen related to said operating modes,

self contained software programs operable with said operation control system at the subscriber's data processing station for identifying program and operating mode options individually authorized by means of said software programs,

means controlled by replaceable software means operable with said operator control system for establishing and controlling fiscal transactions with a further local station in said network of interactive communications, and means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station, *and reconfiguring the operating modes by adding or changing features and introducing new menus*.

\*    \*    \*    \*    \*

US005663757C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9892nd)

# United States Patent
## Morales

(10) **Number:**　　　**US 5,663,757 C2**

(45) **Certificate Issued:**　　　**Oct. 21, 2013**

(54) **SOFTWARE CONTROLLED MULTI-MODE INTERACTIVE TV SYSTEMS**

(75) Inventor: **Fernando Morales**, Reston, VA (US)

(73) Assignee: **EON Corporation**, Tyler, TX (US)

**Reexamination Request:**
No. 90/012,639, Sep. 14, 2012

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **5,663,757** |
| Issued: | **Sep. 2, 1997** |
| Appl. No.: | **07/674,169** |
| Filed: | **Mar. 25, 1991** |

Reexamination Certificate C1 5,663,757 issued Aug. 14, 2012

### Related U.S. Application Data

(63) Continuation-in-part of application No. 07/390,073, filed on Aug. 7, 1989, now Pat. No. 5,101,267, and a continuation-in-part of application No. 07/379,921, filed on Jul. 14, 1989, now Pat. No. 5,036,389.

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 7/03* | (2006.01) |
| *H04N 7/173* | (2011.01) |
| *H04N 7/088* | (2006.01) |
| *H04N 7/087* | (2006.01) |
| *H04N 7/16* | (2011.01) |

(52) **U.S. Cl.**
USPC ................. **725/5**; 348/E7.019; 348/E7.033; 348/E7.034; 348/E7.07; 455/22; 725/24; 725/40; 725/45; 725/56; 725/60; 725/65

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,639, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Eric B Kiss

(57) **ABSTRACT**

A wide range interactive two way communication video system operable nation-wide over satellite links has comprehensive local data processing stations for network subscribers that give a wide range of choices for customizing system features. In particular the system is soft-ware controlled by a programmable computer that comprehensively interconnects one or more interactive features or modes of operation in a local subscriber's unit that may be licensed to or chosen by individual subscribers. Such optionally selected features include data bases, audience response, instantaneous purchasing and billing, channel and program selections, restructuring of system operation, and video games. Multiple slot software capability for receiving chips, discs or other software storage units are provided for customizing data bases, fiscal transactions, access to network facilities and remote stations, operational menus and program selection menus from broadcast, and cable or satellite communications. Subscriber participation is done from an armchair by flicking a finger without interrupting the viewing of program materials, without telephone lines or writing implements. A typical interactive transaction would be instantaneous response to an advertisement in a video broadcast program with a purchase decision which orders a product or service, pays, ships and reorders into inventory the product at different local sites in far-off cities.



US 5,663,757 C2

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

5

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:                                    10

The patentability of claim **7** is confirmed.

Claims **1-6** and **8-10** were not reexamined.

\* \* \* \* \*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EON CORP. IP HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FLO TV INCORPORATED, *et al.*,<br><br>Defendants. | Civil Action No. 10-812-RGA |
| EON CORP. IP HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AT&T MOBILITY LLC,<br><br>Defendant. | Civil Action No. 13-910-RGA |

## MEMORANDUM OPINION

Gregory B. Williams, Esq., FOX ROTHSCHILD LLP, Wilmington, DE; Daniel R. Scardino, Esq. (argued), REED & SCARDINO LLP, Austin, TX; Steven P. Tepera, Esq. (argued), REED & SCARDINO LLP, Austin, TX; John L. Hendricks, Esq. (argued), REED & SCARDINO LLP, Austin, TX.

Attorneys for Plaintiff EON Corp. IP Holdings, LLC.

Karen Jacobs Louden, Esq. (argued), MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Jennifer Ying, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Megan E. Dellinger, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Heidi Keefe, Esq., COOLEY LLP, Palo Alto, CA.

Attorneys for Defendant HTC America, Inc.

Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE; Laura E. Miller, Esq., DURIE TANGRI LLP, San Francisco, CA.

Attorneys for Defendant MobiTV, Inc.

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE;
Frederick L. Whitmer, Esq. (argued), KILPATRICK TOWNSEND & STOCKTON LLP, New
York, NY; Carl E. Sanders, Esq., KILPATRICK TOWNSEND & STOCKTON LLP, Winston-
Salem, NC.

Attorneys for Defendant Motorola Mobility LLC.

Karen Jacobs Louden, Esq. (argued), MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
Wilmington, DE; Jennifer Ying, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
Wilmington, DE; Megan E. Dellinger, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
Wilmington, DE.

Attorneys for Defendants Sprint and Simplexity.

Jack B. Blumenfeld, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE;
Diana M. Sangalli, Esq. (argued), DUANE MORRIS LLP, Houston, TX; Joseph A. Powers,
Esq., DUANE MORRIS LLP, Philadelphia, PA.

Attorneys for Defendant AT&T Mobility LLC.

Richard L. Horwitz, Esq., POTTER, ANDERSON & CORROON LLP, Wilmington, DE;
Harrison J. (Buzz) Frahn IV, Esq. (argued), SIMPSON THACHER & BARTLETT LLP, Palo
Alto, CA; Victor Cole, Esq., SIMPSON THACHER & BARTLETT LLP, New York, NY.

Attorneys for Defendants FLO TV, Inc. and Qualcomm, Inc.

Steven J. Fineman, Esq., RICHARDS, LAYTON & FINGER, PA, Wilmington, DE.

Attorney for Defendant U.S. Cellular Corporation.

Nitika Gupta, Esq., FISH & RICHARDSON P.C., Wilmington, DE.

Attorney for Defendant LG Electronics MobileComm USA, Inc.

March 4, 2014

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

On September 23, 2010, EON Corp. IP Holdings, LLC filed suit against FLO TV

Incorporated, GoTV Networks, Inc., HTC America, Inc., Kyocera Communications Inc., LG

Electronics MobileComm USA, Inc., LetsTalk.com, Inc., MobiTV, Inc., Motorola, Inc., Palm,

Inc., Qualcomm, Inc., Research in Motion Corporation, SPB Software, Inc., Samsung

Telecommunications America LLC, Sprint Nextel Corporation, U.S. Cellular Corporation,

Verizon Communications Inc., and Wirefly, Corp. (collectively, "FLO TV Defendants") alleging

infringement of U.S. Pat. No. 5,663,757 ("the '757 patent"). (1:10-cv-812 D.I. 1). EON also

claimed infringement of the '757 patent by AT&T Mobility, LLC ("AT&T"),[1] AT&T Mobility

Puerto Rico, Inc., Puerto Rico Telephone Company, Inc., Telecomunicaciones de Puerto Rico,

Inc., Telefonica de Puerto Rico, Inc., and Claro, Inc. in a suit filed in the U.S. District Court for

the District of Puerto Rico on June 14, 2011. (1:13-cv-910 D.I. 1). Judge Carreño-Coll severed

all claims between EON and AT&T relating to the '757 patent from the Puerto Rico case and

transferred them to the District of Delaware. (1:13-cv-910 D.I. 326). The Court then

consolidated the cases for purposes of claim construction on August 7, 2013. (1:10-cv-812 D.I.

559).

Eight terms from the '757 patent are computer-implemented means-plus-function claims,

and they have been singled out for construction in this memorandum opinion. (1:13-cv-910 D.I.

423 at 14).[2] The Court has considered the parties' claim construction briefing (D.I. 383-1 to

383-6; 1:10-cv-812 D.I. 400), appendix (1:10-cv-812 D.I. 401), oral argument on January 8,

2013 regarding claim construction (D.I. 419, 420), an evidentiary hearing on claim construction

---

[1] AT&T and the FLO TV defendants will be collectively referred to as "the Defendants."
[2] Unless otherwise noted, all subsequent citations are to the 1:13-cv-910 docket.

3

**A0020**

on February 5, 2013 (D.I. 423), and post-hearing briefing (1:10-cv-812 D.I. 891, 892, 896 & 897).

## I. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application

4

of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Moreover, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

An additional set of principles governs the construction of means-plus-function terms. The Federal Circuit has recognized a presumption in favor of applying 35 U.S.C. § 112, ¶ 6[3] whenever the word "means" is used in the claim language to describe a limitation. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008) ("A claim element that contains the word 'means' and recites a function is presumed to be drafted in means-plus-function format under 35 U.S.C. § 112 ¶ 6."). The presumption can be overcome "where the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003).

---

[3] Now § 112(f).

5

In order for there to be sufficient structure, the claim language must specify "the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).

Once it has been determined that the term is written as a means-plus-function limitation, courts employ a two-part test to construe the term. First, the court is required to determine the claimed function. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006). The second step is to "identify the corresponding structure in the written description of the patent that performs that function." *Id.* The identified structure is required to "permit one of ordinary skill in the art to 'know and understand what structure corresponds to the means limitation.'" *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007)). Otherwise, the term is invalid. *Id.*

In the special case where the corresponding structure is a computer, the patent must disclose an algorithm for performing the claimed function. "[S]imply disclosing a computer as the structure designated to perform a particular function" is insufficient to limit the scope of the claim under § 112, ¶ 6 because "a general purpose computer programmed to carry out a particular algorithm creates a 'new machine' . . . ." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[A] general purpose computer 'in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.'" (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999)).

6

The Federal Circuit carved out an exception to this rule, holding that it is "not necessary to disclose more structure than the general purpose processor" when the claimed functions "can be achieved by any general purpose computer without special programming." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). This exception is a "narrow" one, and an algorithm need not be disclosed "only in the rare circumstances where any general-purpose computer without any special programming can perform the function." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012). Examples of functions that can be carried out by a general purpose computer without special programming include: processing, receiving, and storing. *See In re Katz*, 639 F.3d at 1316 ("Katz has not claimed a specific function performed by a special purpose computer, but has simply recited the claimed functions of 'processing,' 'receiving,' and 'storing.'"). By contrast, any function that involves "more than merely plugging in a general-purpose computer" requires special programming. *Ergo Licensing, LLC*, 673 F.3d at 1365 (finding claim language reciting function of "controlling the adjusting means" to require special programming).

Several recent decisions have addressed the functional capabilities of a general purpose computer. The U.S. District Court for the District of Colorado held that a multi-tasking processing means for "coordinating data transfer" could be accomplished by a general purpose computer without special programming. *EdiSync Sys., Inc. v. Centra Software, Inc.*, 2012 WL 2196047, at *15-17 (D. Colo. June 15, 2012). I previously held that a general purpose computer without special programming could perform the function of displaying an icon. *United Video Props., Inc. v. Amazon.com, Inc.*, 2012 WL 2370318, at *11 (D. Del. June 22, 2012) ("'[D]isplaying' an icon is a common function that can be achieved by any general purpose computer without special programming."); *see also SoftView LLC v. Apple Inc.*, 2013 WL

7

4758195, at *11 (D. Del. Sept. 4, 2013) (finding no algorithm required for "processing means" claim element because that function could be achieved by a general purpose computer without special programming).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. The '757 Patent

There are eight computer-implemented claim terms that the Court has been asked to construe. Claim 8 is representative and recites:

> A local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations, comprising in combination,
>
> an operation control system in said data processing station for controlling video signals, system operating modes and interactive communications available to the subscriber,
>
> a television receiver with a video display screen, program control means and television program channel selection means,
>
> a plurality of sources of video text and television program channels available from said network for individual presentation on said display screen in response to operator control by way of paid [sic] operation control system,
>
> [six additional limitations],
>
> means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels wherein a channel selection menu identifying authorized channels is displayed automatically on said video screen,
>
> means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels and means for causing selected themes to automatically display a second menu displaying available television programs relating to that selected theme, means responsive to said subscriber manual control means for selecting a preferred theme from said different themes presented when said first menu is displayed on said screen, and means in said control system for identifying on said second menu said television programs available relating to the selected theme, and
>
> means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus.

'757 patent, claim 8.[4] Each of the disputed terms contains the word "means," and thus a presumption exists in favor of applying § 112, ¶ 6. *See Net MoneyIN, Inc.*, 545 F.3d at 1366. EON only disputes the application of § 112, ¶ 6 with respect to terms 2 and 3. The presumption has not been overcome for either of those terms because the claim language does not recite "structure sufficient to perform the claimed function in its entirety." *Altiris, Inc.*, 318 F.3d at 1375. Therefore, § 112, ¶ 6 applies to all eight terms.

    1. "Means under control of said replaceable software means for indicating acknowledging of shipment of an order from a remote station" (claim 7)

        a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "messages displayed on viewing screen 11 in FIGS. 2, 3, and 5."

        b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "Indefinite. No structure is disclosed in the specification."

        c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "indicating acknowledging of shipment of an order from a remote station"; proposed structure: "None. Indefinite."

        d. *Court's construction*: "Indefinite."

    The parties agree this is a means-plus-function term with the function of "indicating acknowledging of shipment of an order from a remote station." The dispute is whether the patent discloses sufficient corresponding structure, *i.e.*, whether a general purpose computer

---

[4] Independent claims 1 and 7-10 were amended during reexamination, and dependent claims 2-6 were found to be patentable after amendment to claim 1. The Reexamination Certificate with the amended claims was issued August 14, 2012. A second reexamination certificate, issued October 21, 2013, did not include any amendments.

9

A0026

without special programming in 1991 could perform the claimed function.[5] EON contends that the structure is "messages displayed on viewing screen 11 in FIGS. 2, 3, and 5."[6] The Defendants allege that the patent does not disclose any structure and that the term is indefinite.[7] As described in more detail below, EON's proffered structure is legally insufficient to sustain the term's validity because a general purpose computer in 1991 could not, without special programming, perform the claimed function and no algorithm was disclosed.

Dr. Sauer, EON's expert witness, testified at the evidentiary hearing that the function of "indicating acknowledging of shipment of an order from a remote station" could not be performed by a computer purchased "off-the-shelf." (D.I. 423 at 33 (Q. "It's true, sir, is it not, that you don't know of any general-purpose computer in 1991, that off-the-shelf could perform any of the functions of the computer-implemented terms? A. Off-the-shelf, with the exception of Claim Term [2], all of the computer-implemented terms would require some additional programming.")). The Defendant's expert, Dr. Grimes, agreed that no general purpose computer could perform any of the claimed functions, including "indicating acknowledging of shipment of an order from a remote station." (*Id.* at 63 ("Q. Looking at the functions of the computer-implemented terms in this case, did a general-purpose computer in 1991, perform any of them? A. No. I've examined the terms, as they have been agreed to by the parties in this exhibit that

---

[5] Because all eight terms at issue here are computer-implemented means-plus-function terms, the experts largely discussed the terms together without focusing on any particular term's function or structure. Therefore, the analysis regarding whether a general purpose computer with no algorithm constitutes sufficient structure under § 112, ¶ 6 is equally applicable to each of the subsequent terms. The parties also agree on the function for each term except one, and that term is addressed individually later in this opinion. (1:10-cv-812 D.I. 900 Plaintiff's Exhibit 4; Defendant's Exhibit 4).

[6] EON's structure is insufficient because there is no explanation in the specification as to how the displayed messages are generated, other than by a "microprocessor." '757 patent, Figs. 3 and 5; *see also Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

[7] The Defendants modified the proposed structure for this term after Dr. Sauer, EON's expert, wrote his declaration in support of EON's claim construction. EON contends this caused prejudice because it was too late for Dr. Sauer "to address their argument with respect to the computer-implement[ed] style argument they had changed it to." (D.I. 420 at 59). The prejudice that EON suffered, if any, was cured by the evidentiary hearing where both experts had the opportunity to provide their opinions based on the parties' most up-to-date constructions.

we've been referring to earlier, and for those functions, none of those functions were available on a general-purpose computer."")).

Not only could a general purpose computer bought off-the-shelf in 1991 not perform the function in question, but the experts agree that off-the-shelf software in 1991 would not have been capable of performing the claimed function either. (*Id.* at 38-39 ("Q. Well, [Dr. Sauer], are you aware of any off-the-shelf software applications that a person could have purchased in 1991, to perform without additional software programming, any of the computer-implemented functions of the patent? A. Off-the-shelf software by itself would not be able to implement these computer-implemented terms without additional programming. Q. So the answer is no? A. If I understand the question, the answer is no." (objection omitted)); *id.* at 63 ("Q. And, [Dr. Grimes], let [] me ask you the second question, the big question that I asked Dr. Sauer, were there any commercially-available software applications in 1991, that a consumer could purchase off-the-shelf to perform any of the functions of the computer-implemented terms? A. Not—not that I'm aware of. I mentioned the hardware and software that my company produced, but I'm not aware of anything besides that. Q. And that hardware and software, so that didn't actually perform any of the functions that we're talking about today for Mr. Morales' patent, did it? A. That's correct.")). Instead, special code would have to be written in order to accomplish the claimed functionality. (*Id.* at 40 ("Q. I want to ask you now, [Dr. Sauer], if the function of the computer-implemented terms were not going in the general-purpose computer, and they were not performable by off-the-shelf software applications in 1991, it's true that someone would have to

11

write a computer program to accomplish those functions, correct? A. Someone would have to write a computer program to accomplish the functions of the claim terms.")).[8]

The fact that neither a store-bought computer nor a store-bought computer with store-bought software could achieve the claimed function places this case outside of the *Katz* exception. As stated above, in order to take advantage of the means-plus-function framework, the patentee must disclose the corresponding structure. In the case of a computer-implemented term, that structure is the algorithm. A narrow exception exists, thereby exempting the patentee from the algorithm requirement, if the function could be performed by a general purpose computer without "special programming." The exception's application turns on the meaning of "special" programming—*some* programming must be permissible, but not *special* programming. If that were not the case, the Federal Circuit's use of "special" to describe programming would be rendered superfluous.

In my view, the proper distinction between "special programming" and "programming" is whether the programming in question is commercially available at the time of the invention. If the programming required to perform the claimed function can be purchased off-the-shelf, then it is ordinary programming and no algorithm is required to comply with § 112, ¶ 6's structure requirement. A general purpose computer is sufficient structure in this situation. If, however, a store-bought computer combined with off-the-shelf programming cannot perform the claimed function, then there is a need for special programming, and § 112, ¶ 6 therefore mandates the disclosure of an algorithm. *See Ergo Licensing, LLC*, 673 F.3d at 1365 ("A specially adapted computer is not a general-purpose computer."); *Aristocrat Techs. Austl. Pty Ltd.*, 521 F.3d at

---

[8] Mr. Morales, the inventor, also gave deposition testimony suggesting that one or more engineers were required to complete the necessary programming. (1:10-cv-812 D.I. 649-5 at 5 ("Q. If you didn't personally write that software, who would have been the one to write it? A. We have hundreds of engineers, you cannot imagine.")).

1333 (noting that a "new machine" is created when "a general purpose computer [is] programmed to carry out a particular algorithm"). This framework is consistent with the Constitution's stated purpose of "promot[ing] the progress of science and useful arts" in exchange for a limited, government-sanctioned monopoly. U.S. CONST. art. I, § 8. If the required programming is more sophisticated than what can be readily purchased by a consumer, then the algorithm must be disclosed as the quid pro quo for receiving patent protection.

Processing, receiving, storing, and displaying an icon are functions that any general purpose computer purchased off-the-shelf is capable of performing, which is why no algorithm is required. *See Katz*, 639 F.3d at 1316; *United Video Props., Inc.*, 2012 WL 2370318, at *11.[9] The function at issue here, "indicating acknowledging of shipment of an order from a remote station," is more complicated. EON implicitly conceded as much when its expert stated that no store-bought software installed on a general purpose computer in 1991 could achieve it without additional programming by the user. (D.I. 423 at 40 ("Someone would have to write a computer program to accomplish the functions of the claim terms.")). Without disclosing the algorithm, the public is left without any knowledge of how to carry out the performed function. This is particularly true when there are numerous ways to write even the most simple of computer programs. (*Id.* at 44 ("Q. Sir, [is it] true that not every programmer is going to write a computer program the same way? A. Different programmers have different styles of how they want to do things. Every person has their own probably fairly unique style for exactly how they write a program.")). Dr. Sauer believed that the lack of disclosure was not fatal to EON's case because a

---

[9] The claim construction in *United Video Properties* is currently on appeal. Nonetheless, I felt competent as a computer user to conclude based on personal experience that for a long time general purpose computers with no special programming could display icons. I thought the input of experts was necessary here to resolve the dispute about the capabilities of a computer in 1991. Both experts, I thought, were well-qualified and credible. On the important points, I thought they essentially agreed with each other.

13

"person of relatively elementary skill in the art" could write the code that would perform the function at issue. (*Id.* at 41). But that is inconsequential to the current inquiry. The test is not whether a PHOSITA could write the necessary computer program, but whether the patentee taught the public how to accomplish the claimed function in the specification by disclosing the algorithm. The patentee is required to disclose this expertise in exchange for patent protection. Without it the claim term cannot stand.

In sum, the claimed function of "indicating acknowledging of shipment of an order from a remote station" is indefinite. Pursuant to § 112, ¶ 6's structure requirement, the patentee must disclose an algorithm for carrying out the claimed function unless it could be accomplished by a general purpose computer without special programming—the *Katz* exception.[10] In this case, special programming is needed because off-the-shelf software, when installed on a general purpose computer, cannot perform the claimed function. The *Katz* exception does not apply in this situation, so the algorithm must be disclosed. The patentee here failed to disclose an algorithm, relying instead on a general purpose computer to satisfy the structure requirement. This is insufficient, and the claim term is indefinite as a result.

2. "Means controlled by replaceable software means operable with said operation control system for reconfiguring the operating modes by adding or changing features and introducing new menus" (claims 1-6, 8-10)

a. *Plaintiff's proposed construction*: No construction necessary. Alternatively, if this is a means-plus-function limitation, the function is "reconfiguring the operating modes by

---

[10] I do not think the Federal Circuit's recent decision, *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014), is relevant to the dispute in this case. *Elcommerce* did not involve the application of the *Katz* exception.

14

adding or changing features and introducing new menus," and the structure is "software controlled programmable microprocessor data processing system 27."

     b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "reconfiguring the operating modes by adding or changing features and introducing new menus"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

     c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "reconfiguring the operating modes by adding or changing features and introducing new menus"; proposed structure: "microprocessor 35 and external software 8' (FIG. 4), and statutory equivalents."

     d. *Court's construction*: "Indefinite."

     As discussed above, EON failed to overcome the presumption that § 112, ¶ 6 does not apply to this term. The parties are in agreement over the function. The only issue left for determination is whether the term is indefinite for failing to disclose sufficient structure. During his testimony, Dr. Sauer distinguished this term from the other seven, explaining that he did not believe "reconfiguring the operating modes by adding or changing features and introducing new menus" required any programming to accomplish. (*Id.* at 33 ("Q. It's true, sir, is it not, that you don't know of any general-purpose computer in 1991, that off-the-shelf could perform any of the functions of the computer-implemented terms? A. Off-the-shelf, with the exception of Claim Term [2], all of the computer-implemented terms would require some additional programming. I believe Claim Term [2] could be implemented without additional programming.")). It is Dr. Sauer's opinion that the operating system, by itself, is capable of providing this functionality. (*Id.* at 23 ("A. I would assume that an ordinary user would select a program to be executed,

15

alternate programs from one that is currently running. That [is] something that would be done routinely with the operating system software that is provided. Q. So, in other words, no additional programming at all? A. No additional programming.")). When questioned on cross-examination, however, Dr. Sauer conceded that additional programming by someone would be required to perform the function of this claim term:

> Q. Just so we're clear, sir, it is your opinion that a person of ordinary skill in the art would have to program a 1991 general-purpose computer, as you have used that term, to perform the menu functions from Term [2]?
> A. Perform[ing] the menu functions from Term [2] would require either— would require additional programming by someone. It might be provided by an off-the-shelf application, which is why my original interpretation of Claim [2—]
> Q. All right. Just so we're clear—
> A. Someone would do that programming.
> Q. Programming to accomplish the agreed function of Claim Term [2] requires additional programming, we've agreed on that?
> A. To introduce the menus requires additional programming.
> Q. And the reason that you need additional programming for the computer-implemented terms is because the functions that they perform were not going [to be] part of the operating system on a general-purpose computer?
> A. An operating system would not provide the function in these claim terms.
> Q. In fact, the specific capabilities of these claim terms were not performable by any of the operating systems that came loaded or could be loaded onto a general-purpose computer; is that correct?
> A. The operating systems, by themselves, as they came loaded or purchased off-the-shelf to be installed, would not provide the functions of these claim terms.
> Q. And that's why you needed additional programming?
> A. That's why additional programming is needed.

(*Id.* at 36-37). Dr. Grimes testified that additional programming was required. (*Id.* at 75-76 ("Q. Again, back in 1991, was there a commercially-available software that would perform this function for an interactive TV system? A. No, there was not. The interactive TV aspect of it was really not available off-the-shelf and certainly wasn't present in the standard general-purpose computers of the day. Q. So, if it wasn't available off-the-shelf in an application for a

16

general-purpose computer, what would you have to do? A. Well, you would have to write the software and add the hardware, in some cases, to be able to implement these functions. In this case this function of [term 2].")).[11] Because additional programming would be required, this term is indistinguishable from the other disputed terms for purposes of claim construction. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

3. "Means responsive to said self contained software for establishing a mode of operation for selection of one of a plurality of authorized television program channels" (claim 8)

a. *Plaintiff's proposed construction*: No construction necessary. Alternatively, if this is a means-plus-function limitation, the function is: "establishing a mode of operation for selection of one of a plurality of authorized television program channels," and the structure is: "microprocessor 35 and menus shown in Figs. 3-5 and statutory equivalents."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing a mode of operation for selection of one of a plurality of authorized television program channels"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

---

[11] To the extent there is a factual dispute between the experts on this point, Dr. Sauer's tentative testimony that the functionality "might" be provided in an off-the-shelf application is less persuasive than Dr. Grimes's unequivocal statement that store-bought software was insufficient to perform term 2's function. I find that the evidence is clear and convincing that in 1991 store-bought software was insufficient to perform the identified function.

17

c. *AT&T's proposed construction*: Proposed function: "establishing a mode of operation for selection of one of a plurality of authorized television program channels"; proposed structure: "microprocessor 35 and menus shown in Figs. 3-5 and statutory equivalents."

d. *Court's construction*: "Indefinite."

As discussed above, EON failed to overcome the presumption that § 112, ¶ 6 does not apply to this term. The parties agree on the function. The only issue left for determination is whether the term is indefinite for failing to disclose sufficient structure. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

4. "Means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels" (claim 8)

a. *Plaintiff's proposed construction*: Not governed by 35 U.S.C. § 112, ¶ 6. Alternatively, if this is a means-plus-function limitation, the function is "establishing a first menu directed to different interactively selectable program theme subsets," and the structure is "microprocessor 35 and program control software."

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing a first menu directed to different interactively selectable program theme subsets available from said authorized program channels"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing a first menu directed to different interactively selectable program theme

18

subsets available from said authorized television channels"; proposed structure: "indefinite" or "text generator NTSC format 25, modulator 26, microprocessor 35, menu 11', stored information as described at 6:4-8 and external software 8', and statutory equivalents."

        d. *Court's construction*: "Indefinite."

The parties disagree over both the function and the corresponding structure, although the Defendants allege that the term is indefinite regardless of which proposed function is correct. (1:10-cv-812 D.I. 400 at 89 ("[W]hether that function is construed as 'establishing a first menu directed to different interactively selectable program theme subsets,' as EON proposes, or also includes the language 'available from said authorized television program channels,' as the law requires, *Lockheed*, 324 F.3d at 1319, the outcome is the same: neither function can be performed by simply plugging in a general purpose computer.")). The Court agrees that both proposed functions would require additional programming and adopts EON's construction. (D.I. 423 at 37 ("The operating systems, by themselves, as they came loaded or purchased off-the-shelf to be installed, would not provide the functions of [the computer-implemented] claim terms.")). For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

19

5. "Means for causing selected themes to automatically display a second menu" (claim 8)

      a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "microprocessor 35 and program control software (Figs. 3-5)."

      b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

      c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "causing selected themes to automatically display a second menu"; proposed structure: "indefinite" or "text generator NTSC format 25, modulator 26, microprocessor 35, menu 11', stored information as described at 6:8-14 and external software 8', and statutory equivalents."

      d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

6. "Means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station" (claim 9)

      a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data

20

of the local subscriber's data processing station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

       b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

       c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station"; proposed structure: "indefinite" or "microprocessor 35, external read only memory software storage unit 7 as described at 5:40-43, and statutory equivalents."

       d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

    7. "Means controlled by replaceable software means operable with said operation control system for establishing and controlling fiscal transactions with a further local station" (claim 10)

       a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

21

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing and controlling fiscal transactions with a further local station"; proposed structure: "indefinite" or "microprocessor 35, external read only memory software storage unit 7 as described at 5:43-47, PROM (subscriber ID) 31 as described at 3:56-60 & 5:32-34, and statutory equivalents."

d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

8. "Means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station" (claim 10)

a. *Plaintiff's proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "microprocessor 35 and system control 8 (FIG. 3)."

22

b. *FLO TV Defendants' proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "Indefinite. Structure is microprocessor but no algorithm disclosed."

c. *AT&T's proposed construction*: A means-plus-function limitation. Proposed function: "establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station"; proposed structure: "indefinite" or "microprocessor 35, RF beep transmitter 30, external read only memory software storage unit 7 as described at 5:40-43, PROM (subscriber ID) 31 as described at 3:56-60 & 5:32-34, external software 8', and statutory equivalents."

d. *Court's construction*: "Indefinite."

The parties agree on the function. For the reasons stated in section II.A.1, *supra*, a general purpose computer without special programming in 1991 could not perform the claimed function. This renders the *Katz* exception inapplicable. In order to avoid a finding of indefiniteness, therefore, the '757 patent must disclose an algorithm to accomplish the function. It does not, and the term is indefinite as a result.

## III. CONCLUSION

For the reasons set forth above, the eight computer-implemented means-plus-function terms are indefinite. An appropriate order will follow.

23

A0040

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EON CORP. IP HOLDINGS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 10-812-RGA |
| FLO TV INCORPORATED, *et al.*, | |
| Defendants. | |
| | |
| EON CORP. IP HOLDINGS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 13-910-RGA |
| AT&T MOBILITY LLC, | |
| Defendant. | |

## ORDER

For the reasons set forth in the Court's Memorandum Opinion on claim construction

holding eight terms of the '757 patent indefinite, the Defendants' Motion for Summary Judgment

of Invalidity (1:10-cv-812 D.I. 645) is **GRANTED**. All asserted claims are invalid. The

following motions in the 1:10-cv-812 docket are **DISMISSED AS MOOT**: 605, 622, 625, 628,

631, 632, 638, 642, 643, 652, 653, 658, 660, 664, and 745.

Entered this 4th day of March, 2014.

United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EON CORP. IP HOLDINGS LLC,     :
                                 :

            Plaintiff,     :
                                 :

        v.                  :          Civil Action No. 10-812-RGA
                                 :

FLO TV INCORPORATED, et al.,     :
                                 :

            Defendants.     :

## **JUDGMENT**

For reasons set forth in the Court's Memorandum Opinion and Order dated March 4,

2014 (D.I. 907 and 908);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of

FLO TV Incorporated, MobiTV Inc., U.S. Cellular Corporation, LG Electronics MobileComm

USA, Inc., Sprint Nextel Corporation, HTC America Inc., LetsTalk.com Inc., Qualcomm Inc.,

Simplexity, LLC, Motorola Mobility LLC and against EON Corp. IP Holdings LLC.


                                        _____
                                         United States District Judge

Dated: 4/5/2014

                                         _____
                                         (By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EON CORP. IP HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-910 (RGA) |
| | ) | |
| AT&T MOBILITY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>JOINT STIPULATED FINAL JUDGMENT</u>

For the reasons set forth in the Court's Memorandum Opinion and Order dated March 4,

2014 (D.I. 447 and 448) and in accordance with the joint stipulation of the parties:

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of

AT&T MOBILITY LLC and against EON CORP. IP HOLDINGS LLC.:

SIGNED AND ENTERED this 18th day of March, 2014.

RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

(By)      Deputy Clerk

## CERTIFICATE OF SERVICE

I certify that on July 2, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which will send notification of such filing to all registered participants.  I also certify that I have caused copies to be served on the following via United States First Class Mail.


    */s/  John L. Hendricks*

John L. Hendricks
Reed & Scardino LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-615-5792
jhendricks@reedscardino.com

Counsel for Plaintiff-Appellant

July 2, 2014


| | |
|---|---|
| Richard L. Horwitz | Jack B. Blumenfeld |
| Email: rhorwitz@potteranderson.com | Email: jblumenfeld@mnat.com |
| POTTER ANDERSON & CORROON, LLP | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| 1313 N. Market Street | 1201 North Market Street |
| Hercules Plaza, 6th Flr. | Wilmington, DE 19899 |
| Wilmington, DE 19899-0951 | *ATTORNEY FOR MOTOROLA MOBILITY LLC* |
| *ATTORNEY FOR FLO TV INCORPORATED AND QUALCOMM, INC.* | |

Brian E. Farnan
Email: bfarnan@farnanlaw.com
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
**ATTORNEY FOR MOBITV, INC.**

Steven J. Fineman
Email: fineman@rlf.com
RICHARDS, LAYTON & FINGER, PA
One Rodney Square, 920 N. King Street
Wilmington, DE 19801
**ATTORNEY FOR U.S. CELLULAR CORPORATION**

# CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32:

1.    Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), this brief meets the type-volume limitation because it contains no more than 14,000 words. Specifically, it contains 13,476 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style.  Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.


          */s/ John L. Hendricks*

          John L. Hendricks
          Reed & Scardino LLP
          301 Congress Ave., Ste. 1250
          Austin, Texas 78701
          512-615-5792
          jhendricks@reedscardino.com

          Counsel for Plaintiff-Appellant

          July 2, 2014